IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JUNO USA, LP, *et al.*,[1] | Case No. 19-12484 (MFW) |
| Debtors. | (*Joint Administration Requested*) |

**DECLARATION OF MELISSA S. KIBLER
IN SUPPORT OF FIRST DAY PLEADINGS**

I, Melissa S. Kibler, hereby declare (this "**Declaration**") under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1. I am the chief restructuring officer ("**CRO**") of Juno USA, LP ("**Juno**") and each of its affiliated debtors and debtors in possession (collectively with Juno, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). I am a Senior Managing Director at Mackinac Partners LLC ("**Mackinac**"), a financial advisory firm that provides, among other things, restructuring, crisis and turnaround management services.

2. I have over 28 years of experience in providing financial advisory, restructuring and turnaround services and have advised companies, lenders, creditors, corporate boards and equity sponsors across a diverse range of industries both domestically and internationally. I have assisted clients both in and outside of chapter 11, designed and evaluated financing packages and presentations to various types of lenders and equity investors, and acted as financial advisor to boards of directors, principal shareholders or other stakeholders in the purchase, sale or wind-down of businesses. I have served as a financial advisor in restructurings and/or related litigation for

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Juno USA, LP (5772); Sabo One LLC (2759); Juno Oregon LLC (4462); Vulcan Cars LLC (4733); GT Forge, Inc. (1093); and Omaha LLC (8656). The mailing address for the Debtors listed above is 74 West Long Lake Road, Suite 205, Bloomfield Hills, Michigan 48304.

debtors/companies in matters such as Delta Career Education Corp. (acquirer), Tronox, Sprint, North Pacific Group, Havens Steel, Avcraft, Alterra, Archdiocese of Portland, Assisted Living Concepts, BMK, Physician Partners and Iridium; the examiner, trustee or receiver in matters including Residential Capital, Calumet, Sentinel Management Group and Capital Consultants; creditors or official committees in cases such as Energy Future Holdings, Savient, Neff, Chrysler, Quebecor, Engineered Plastic Products, Kmart, Bethlehem Steel, LTV Steel, Warnaco Group and Singer; and other stakeholders in matters including FirstMed EMS, Keywell, International Offshore Services, ASARCO, Amaranth, Mervyn's and Enron, as well as many confidential matters.

3. On October 24, 2019, Mackinac was retained by the Company as restructuring financial advisor to provide certain advisory services in connection with the Company's ongoing evaluation, development and implementation of strategic alternatives to address its financial performance and capital structure. On November 19, 2019, I was appointed as CRO of the Company. Since Mackinac's retention, my team has provided strategic and financial advisory services to the Company's management team in concert with the other advisors retained by the Company in connection with preparing for the Chapter 11 Cases.

4. Concurrently with the filing of this Declaration (the "**Petition Date**"), each of the Debtors filed a voluntary petition (collectively, the "**Petitions**") in the United States Bankruptcy Court for the District of Delaware (this "**Court**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). To minimize the potential adverse impact of the commencement of these Chapter 11 Cases, the Debtors have requested certain "first day" relief in various applications and motions filed with the Court, each of which is listed on the attached **Exhibit A** (collectively, the "**First Day Pleadings**"). The First Day Pleadings seek relief intended

to preserve the value of the Debtors by, among other things, establishing certain administrative procedures to facilitate an orderly transition into and out of these Chapter 11 Cases. This relief is critical to the Debtors' restructuring and liquidation efforts.

5. This Declaration is submitted to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these Chapter 11 Cases and in support of the Petitions and the First Day Pleadings. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge. I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

6. In just over three and a half years since inception, Juno has made its mark as the third largest ride-hailing business in New York. With advantageous commission and pricing structures, coupled with a user-friendly and straightforward mobile application, drivers and riders alike were drawn to the Company immediately upon its entry into the marketplace. At one point during peak operational success, Juno had contracted with approximately 50,000 drivers in the New York area, offering nearly 50,000 rides per day.

7. This success is what drew Gett (*as defined below*)—a leading global transportation network company (or "**TNC**") and a former competitor in the US market—to seek to purchase Juno and build upon its success. Upon its 2017 acquisition of Juno, Gett entirely shut down its own US operation, so that it could focus solely on expanding the Juno business and brand. Gett's

investment in supporting the Company's driver-centric core values and competitive pricing structures enabled Juno to achieve the success that it did in only a short period of time.

8. But due to severe, newly implemented local regulations, compounded with an ever-increasing number of opportunistic litigation claimants—all as further described below—the Company recognized that it could no longer continue to operate with any hope of long-term profitability or going-concern value. After exploring several strategic alternatives, the Company determined that it was in the best interests of all stakeholders to shut down US operations. This decision was not taken lightly and was reluctantly approved by the Company's board only once it became clear that an orderly process would be the sole way in which the Company could preserve value for—and, as appropriate, distribute funds to—its creditors. For the Company, it was essential that all drivers were paid in full, which is precisely what happened prior to the filing of these Chapter 11 Cases.

9. While the Company has thus shut down its "business-to-consumer" ("**B2C**") operations, *i.e.*, the Juno ride-hailing application, and will seek through this process to liquidate its operating entities, the Company believes that the know-how and innovation that it has developed and can continue to offer to the market may be most effectively utilized in the "business-to-business" ("**B2B**") context. To this end, GT Forge intends to develop strategic partnerships with certain competitors in the ride-hailing space and, through this restructuring process, intends to emerge as a member of a leading global "business-to-business" ("**B2B**") transportation network company. This transition also will enable the Company to work collaboratively with its former competitors, rather than attempt to contend with them in the most competitive ride-hailing market in the world.

10. The Debtors are working with their professionals to finalize the terms of a plan sponsorship agreement with their parent entity, Gett, which will enable the Debtors to fund creditor recoveries in these cases, while effectuating the liquidation of the Debtors' operating entities and the restructuring and emergence of Forge. This proposal will be submitted to and reviewed by the Debtors' independent (and sole) director, Mr. David Eaton ("**Mr. Eaton**" or the "**Independent Director**"), an experienced and well-respected restructuring professional who was hired after a competitive prepetition vetting process, and whose role is further described below. The Debtors will also submit a joint plan of reorganization and liquidation in the early stages of these cases—while concurrently working collaboratively with each of their creditor constituencies—to ensure a smooth and efficient transition into, through and out of these Chapter 11 Cases.

11. To familiarize the Court with the Debtors and the relief that the Debtors seek early in these Chapter 11 Cases, this Declaration is organized in four parts. **Part I** provides an introduction to the Debtors and relevant information on their corporate history and business operations. **Part II** describes the Debtors' prepetition debt obligations and outstanding litigation. **Part III** describes the circumstances and key events that led to the commencement of these Chapter 11 Cases. **Part IV** briefly addresses the First Day Pleadings.

## I.
## JUNO'S CORPORATE HISTORY AND BUSINESS OPERATIONS

A. **BRIEF BACKGROUND**

12. Juno was a ride-hailing, mobile application-based TNC that operated in New York, New York, where its headquarters are located. Juno launched its mobile application and began offering its services in early 2016. Founded on the simple premise of "Happy Drivers, Happy Riders," Juno—from inception—offered drivers particularly attractive commission structures and economic incentives (including restricted stock units, or "**RSU**"s) as compared to its several

competitors, with the expectation that such an approach would result in an overall enhanced driving experience for drivers and, in turn, riders.

13.     In its first year, Juno's value proposition bore fruit, as business grew and Juno solidified its place as the third strongest player (after Uber and Lyft) in the New York market. Indeed, in the first four months of 2016, Juno, through its beta mobile application, onboarded approximately 25,000 New York drivers. Nonetheless, competition was steep—after all, New York is one of the most competitive ride-hailing markets in the world—not only from Uber and Lyft, but also from several smaller TNCs, including Forge, which was doing business as "Gett."

14.     At that time, Gett had also only recently expanded into the US market—having achieved success abroad in the United Kingdom, Russia and Israel—and soon decided to team up with Juno to face their mutual competitors. To that end, in April 2017, Gett purchased Juno and certain of its affiliates. Under the purchase agreement, Forge became the general partner of Juno USA, LP,[2] and Gett became the limited partner, later assigning that limited partnership interest to its subsidiary (and Forge's parent) Dooboo Holding Limited ("**Dooboo**"), a limited company organized under the laws of Cyprus.

15.     As part of the acquisition, Gett closed its operations in the US and, to the best of its ability, transferred its riders to Juno through application-based offers, discount codes and incentives. Juno's employee base remained entirely intact, and with the addition of two of Gett's employees, the Company emerged from the acquisition with 34 New York-based employees to handle marketing, onboarding, finance and general operations. Following the acquisition, the Company bought out all drivers' RSUs, ceasing that compensation program entirely; it did,

---

[2]    The previous general partner was an entity called Juno, Inc., which was not acquired by Gett.

however, continue to offer one of the most competitive commission structures in the marketplace and, as such, continued to onboard drivers, at one point contracting with over 50,000 individuals.

16.     Prior to the filing of these Chapter 11 Cases, the Company also utilized two customer service centers: The primary center was in Israel, operating under a non-debtor affiliated Israeli entity, Juno Lab Ltd. ("**Juno Israel**"), while the "night shift" center was in Oregon, operating under the Debtor entity Juno Oregon LLC ("**Juno Oregon**"). Utilizing these two entities in temporally removed time zones enabled the Company to staff a 24/7 customer support operation. Juno's research and development was undertaken by Juno Lab LLC, a Belarussian non-debtor affiliate.

B.     **ORGANIZATIONAL STRUCTURE**

17.     The chart below represents the organizational structure of the Debtors (marked in blue) and certain of their non-debtor affiliates:



18. As shown in the summary chart, GT Gettaxi Limited ("**Gett**"), a limited company organized under the laws of Cyprus, is the majority shareholder and parent entity of substantially all of Gett's operations worldwide, including Juno. As further discussed below, Gett is the proposed DIP financing lender and plan sponsor in these Chapter 11 Cases.

19. Debtor Vulcan Cars LLC ("**Vulcan**"), which is wholly owned by Juno, served as the contract counterparty for the individual driver contracts entered into prior to Gett's acquisition of Juno (whereas as Juno served as the contract counterparty for driver contracts entered into thereafter). Vulcan also served as Juno's "dispatch base" entity: Every TNC in New York City, under Taxi and Limousine Commission ("**TLC**") regulations, must affiliate with a physical dispatch base, and Vulcan is the Company's primary entity through which it creates such affiliations. Omaha, LLC ("**Omaha**"), which is also wholly owned by Juno, served as a "backup base" to Vulcan, in the unlikely scenario in which Vulcan might be suspended by the TLC for any given reason. In fact, every TNC utilizes such a "backup base" given that suspension of the primary base, absent such a failsafe, would indefinitely (and suddenly) shut down operations.

20. Prior to Gett's acquisition of Juno, Sabo One LLC ("**Sabo One**"), which is wholly owned by Forge, served as the "dispatch base" entity for Forge. That entity, however, has since been dormant. Forge also owns 100% of Juno Oregon (*as described above*) and is the general partner of Juno.

C. **BUSINESS OPERATIONS**

21. Juno's business model was typical for a TNC: First, a rider selects one of three types of vehicles for hire: (i) "*Bliss*," a standard vehicle for up to four passengers; (ii) "*Lux*," a more luxurious vehicle, also for up to four passengers; or (iii) "*SUV*," a larger vehicle that holds up to six passengers. Next, the application searches for the nearest driver with the shortest potential

route to the passenger; the first driver in the area who meets these criteria and elects to pick up the passenger is matched with the rider. Finally, once the ride is over and the driver marks the ride as "complete," the rider is charged a fee comprising a fixed minimum amount, plus costs based on time and distance. Certain "high-demand" pricing goes into effect during particularly busy times of the day (of which riders are aware before selecting a ride). At the ride's conclusion, a rider may leave an optional tip through the Juno application.

22. At the end of each day, drivers could elect to receive instant payment for that day's rides at a cost of $0.50 per ride, or instead leave funds in their driver account until the next Tuesday, when all payments were then released to drivers for all rides through the evening prior, free of charge. From the time Juno first launched and through May 2018, Juno charged drivers a 10% commission on each ride, such that drivers collected 90% of their base fares, plus 100% of tips. As of June 2018, the Company was forced to increase commissions to 16.65% to offset additional city and state regulatory fees and costs. This commission structure, however, still represented the lowest of that by any of the major TNCs.

23. As noted above, the Company also operated a 24/7 "real human" customer support operation through two entities—Juno Oregon and Juno Israel—each of which employed approximately 50 customer-support personnel. These support centers were available to riders and drivers alike, offering the ability to conveniently reach a support person by phone at any time of day.

D.     **FINANCIAL SUMMARY**

24.     Juno's financial performance largely reflected a success story in its first two full years of operations. By year end of 2017, the Company had generated over $218 million in gross revenues; that number only increased the following year, when, in 2018, gross revenues reached approximately $269 million, representing approximately 23% annual growth.

25.     That said, Juno's operating costs and expenses—including for salaries, rent, vendor payments, and legal fees—remained high in the early stages of the Company's growth, and thus it received its operating funds from Gett, which has infused a significant amount of capital into the Company since the April 2017 acquisition.[3] These operating expenses were typically funded on a monthly basis (or more frequently, as necessary).

26.     Juno's significant investment requirements were compounded by more recent challenges facing the Company, most notably related to the implementation of burdensome local regulations and escalating litigation defense costs. Indeed, as a result of these hurdles—each of which is further described below—Juno generated only $133 million in revenue this past year-to-date through September 30, 2019, an annualized gross revenue decline of 34%.

**II.
THE COMPANY'S PREPETITION DEBT OBLIGATIONS AND LITIGATION**

27.     As of the Petition Date, the Company's debt obligations consisted primarily of real property lease obligations, significant legal defense costs in connection with several expensive causes of action, and trade debt. In addition, Sberbank Investments, as security agent, holds a perfected, first-priority all-asset lien against Forge—which includes an interest in Forge's

---

[3] Prior to the April 2017 acquisition, Juno and Vulcan were guarantors under that certain secured facilities agreement between Gett and Juno, Inc. (referenced in footnote 2 above). In connection therewith, Gett held first-priority perfected, all-asset liens against Juno and Vulcan, as guarantors. Following the April 2017 acquisition, Gett agreed to terminate the facilities agreement and release the borrower and guarantor parties thereto (including Juno and Vulcan). However, the ministerial task of filing a UCC-3 was not completed prior to the Petition Date.

subsidiary holdings, including its partnership interest in Juno—based on a secured guaranty granted by Forge in connection with Gett's secured financing facility.

A. **REAL PROPERTY LEASE OBLIGATIONS**

28. The Company maintains two primary nonresidential real property leases for operations: (i) for the Company's primary marketing, onboarding and financial operations, office space at the World Trade Center in New York, New York, under which the Debtors pay approximately $74,000.00 in monthly rent; and (ii) for the Company's US-based customer support team, office space in Portland, Oregon, under which the Debtors pay approximately $24,000.00 in monthly rent. As credit support for these leases, the Company is obligated on two letters of credit for which it maintains collateral in the form of money market accounts in the respective amounts of $414,419.00 and $375,000.00. The Company also leases, and in turn sublets, certain office space in Long Island City, New York, under which the Company pays the landlord $13,000.00 in monthly rent, but also receives $10,071.00 in monthly rent from its sublessee.[4]

B. **LITIGATION**

29. The Company faces four different fronts of litigation: (i) two multi-million dollar class-action lawsuits brought by drivers in connection with the terminated RSU program; (ii) three patent infringement lawsuits brought by certain competitors; (iii) multiple personal injury lawsuits brought by riders, the majority of whom allege to have been passengers in an automobile accident while riding with a Juno driver; and (iv) multiple unemployment insurance suits brought by drivers, under which the drivers seek a determination that they are employees, not independent contractors, and are thus allegedly entitled to certain unemployment benefits. The Company

---

[4] Forge is also the lessee on a corporate apartment lease in New York, which was utilized by a former director for business purposes. Contemporaneously herewith, the Debtors have filed a motion to reject this lease *nunc pro tunc* to the Petition Date.

contests the allegations in each of the aforementioned lawsuits and actions, and has vigorously defended itself against these lawsuits over the last several months and—in some cases—years.

### C.  TRADE DEBT

30.  As of the Petition Date, the Company estimates that approximately $300,000.00 was due and owing to holders of prepetition trade claims. The claimants primarily comprise vendors who provide digital marketing and web-services.

### III. CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

### A.  REGULATORY AND MARKET CONDITIONS

31.  Many of Juno's financial challenges have been imposed upon the Company by local legislative forces. New York City's recent wage legislation, which was approved by the TLC in December of last year and was implemented this past February, instituted a "pay floor" for ride-hail drivers, who—as independent contractors—are not otherwise governed by minimum-wage legislation. The new rules require that drivers receive a minimum of $17.22 per hour, regardless of the number of rides performed (and resulting revenue generated) during that time.

32.  This minimum amount was derived from an analysis conducted by two economists in mid-2018. Their formula accounts for the length and distance of a given ride: drivers must be compensated a minimum of $0.58 per mile, plus a minimum of $0.287 per minute. Each of these figures is separately divided by a so-called "utilization rate," which is calculated based on the frequency that a TNC sends trips to drivers while they are available for work. The current industry-wide average utilization is 58%.

33. By way of example, for a 10-mile trip that takes 30 minutes, the formula provides as follows:

$$\frac{\$0.58 \text{ (pp/mile)} \times 10 \text{ (miles)}}{0.58 \text{ (utilization)}} + \frac{\$.287 \text{ (pp/minutes)} \times 30 \text{ (minutes)}}{0.58 \text{ (utilization)}} = \mathbf{\$24.84}.$$

According to the analysis, utilizing this formula results in average gross earnings for the typical driver of $25.76 per hour, and net income of $17.22 per hour after expenses (as noted above).[5] The City of New York posits that "[t]his figure is the equivalent of $15 per hour for a regular employee . . . [t]he additional $2.22 accounts for the 7.65 percent ($1.32 per hour) drivers must pay in payroll taxes . . . plus 6 percent ($0.90 per hour) for paid time off[.]"[6]

34. The apparent motive for this new legislation was to reduce drivers on the road; after all, the fewer number of drivers, the higher the demand, and thus the easier a company could achieve the "pay floor" for its drivers (by increasing its utilization rate). In furtherance of this objective, the TLC also imposed a one-year moratorium on new driver licenses.

35. What's more, additional new regulations have caused customer pricing to recently increase by nearly 20%. For example, in some "congestion zone" areas, *i.e.*, any ride below 96th street in New York City, the TLC imposed an additional $2.75 per-ride fee on riders.

36. The impact of these rule changes was drastic for the Company. Not only did ridership decrease as a result of necessary increased pricing—for example, in 2017, Juno facilitated approximately 47,000 rides per day, whereas immediately prior to filing these Chapter 11 Cases, rides had decreased to fewer than 25,000 per day—but average hourly driver earnings decreased, too. Whereas certain competitors responded to these challenges by capping the number of drivers

---

[5] See http://rules.cityofnewyork.us/tags/utilization-rate.
[6] *Id.*

who could access their application at any given time, Juno refused to implement this approach, given its core driver-centric values. This resulted in increased exposure to the utilization rate "pay floor" rules, which Juno and its affiliates have attempted to challenge in New York state court.[7]

37. To be sure, these rule changes have impacted all of the major ride-hailing companies in the market. But while the larger companies are able to sustain such a hit given their significant financial backing and diverse presence around the country (and the globe), which enables them to subsidize rides, and offer discounts and promotions, Juno, on the other hand, which operated only in New York, faced swelling losses and an unsustainable financial future in the B2C marketplace.

### B. LITIGATION COSTS AND RESOURCES

38. The Company is confident that, if brought to their respective conclusions, each of the causes of action described above would be dismissed or otherwise disposed of in the Company's favor. In fact, the Company has succeeded in many such defense efforts to date. But in the meantime, leading up to the Petition Date, the Company spent hundreds of thousands of dollars per month in legal defense fees. And with respect to the driver and rider suits, no end appeared in sight, as opportunistic litigants continued to try their luck in the court system at the Company's expense. As a result, the Company's management team was forced to expend valuable time and resources devoted to these legal matters, necessarily impeding on the team's managerial and operational efforts to sustain and support the growth of the business.

---

[7] *See Omaha LLC and Vulcan Cars LLC v. New York City Taxi and Limousine Commission and Meera Joshi, in her official capacity as Chair, Commissioner, and Chief Executive Officer of the New York City Taxi and Limousine Commission* (N.Y. Sup. Ct. N.Y. Cty. No. 650574/2019).

C.  **JUNO'S PREPETITION RESTRUCTURING EFFORTS AND COMMENCEMENT OF THESE CHAPTER 11 CASES**

39. Prior to filing these Chapter 11 Cases, the Company explored various strategic alternatives in lieu of filing for chapter 11. And although the Company implemented certain austerity measures and operational cuts, ultimately—facing the aforementioned challenges—it determined that there was no viable, long-term path to sustain operations as a B2C company.

40. The Company thus determined, in an exercise of its reasonable business judgment, that its stakeholders would be best served by the Company's liquidation of its current B2C operations, and by the restructuring of its parent entity, Forge. To that end, prior to the filing of these Chapter 11 Cases, the Company informed its employees that it would be shutting down operations. That said, the Company, under its contemporaneously filed wages motion, seeks to honor all severance obligations and any "stub" payments that were not processed prior to the filing. With respect to the non-employee, independent contractor drivers, each driver received final payment for all rides prior to the application's shutdown.

41. Through a restructured Forge, the Company will be able to leverage its reputation as an innovative player in the ride-hailing market while shifting its focus and efforts to B2B strategic partnerships and services. This transition will enable increased collaboration between the Company and its former competitors. What's more, the Company will be relatively free from the regulations that were primary burdens for Juno's operations, and will also be largely unsaddled by the seemingly never-ending opportunistic litigation.

42. The Debtors have already received a proposed DIP financing commitment from Gett to effectuate the aforementioned process—as more fully described in the contemporaneously filed DIP motion—as well as a proposed plan sponsorship from Gett to fund and support the Debtors' joint plan of reorganization and liquidation, which the Debtors intend to file with the

Court in the coming days. Given these parties' affiliations, Mr. Eaton was employed as the Debtors' independent director prior to the filing of these Chapter 11 Cases.

43. The Independent Director serves as the sole director of the Company. He is entrusted to approve any decisions with respect to Gett's proposed plan sponsorship, and he has already approved Gett's proposed DIP financing (subject to Court approval). Mr. Eaton—who was hired after a thorough interview process—is highly respected and experienced in restructuring matters, and the Debtors believe that his role will be critical.

44. The Debtors believe that the aforementioned efforts will pave a strategic path that benefits all estate constituents in an efficient and fair manner.

## IV.
## THE DEBTORS' FIRST DAY PLEADINGS

45. Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings in these Chapter 11 Cases seeking orders granting various forms of relief intended to facilitate the efficient administration of these Chapter 11 Cases and pursue and consummate a joint plan of reorganization and liquidation.

46. I have reviewed each of the First Day Pleadings listed on **Exhibit A**, and the facts set forth therein are true and correct to the best of my knowledge, information and belief.

47. I believe that the relief requested in the First Day Pleadings is necessary to avoid immediate and irreparable harm and to allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases.

48. Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety.

I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief to the Debtors as is just and proper.

Dated:  November 19, 2019  
         Chicago, Illinois

/s/ Melissa S. Kibler  
Melissa S. Kibler

# **LIST OF FIRST DAY PLEADINGS**

(1) Motion of the Debtors for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases

(2) Motion of the Debtors for Entry of an Order Authorizing the Debtors (i) to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, and (ii) to File a Consolidated List of the Debtors' Twenty (20) Largest Unsecured Creditors

(3) Application of the Debtors for Entry of an Order Appointing Omni Agent Solutions, Inc. as Claims and Noticing Agent

(4) Motion of the Debtors for Entry of an Order Limiting Service

(5) Motion of the Debtors for Entry of Interim and Final Orders (a) Authorizing the Continued Use of the Debtors' Cash Management System, (b) Authorizing Continued Transfers Among Debtors and Non-Debtor Affiliates, and (c) Scheduling a Final Hearing on the Motion

(6) Motion of the Debtors for Interim and Final Orders (i) Authorizing the Debtors to Pay Certain Prepetition Wages and Compensation, (ii) Authorizing the Continuation of Employee Benefit Programs, (iii) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations, and (iv) Granting Related Relief

(7) Motion of the Debtors for Entry of an Order Authorizing the Debtors to Continue Their Insurance Policies and Pay Prepetition and Postpetition Obligations in Respect Thereto

(8) Motion of the Debtors for Entry of an Order (i) Authorizing the Debtors to Pay Certain Prepetition Taxes and (ii) Granting Related Relief

(9) Motion of the Debtors for Entry of Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition Secured Financing, (ii) Authorizing the Use of Cash Collateral, (iii) Modifying the Automatic Stay, (iv) Scheduling a Final Hearing, (v) and Granting Related Relief