## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JUNO USA, LP, *et al.*,[1] | Case No. 19-12484 (MFW) |
| Debtors. | (*Joint Administration Requested*) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED
FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL,
(III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING
A FINAL HEARING, (V) AND GRANTING RELATED RELIEF**

Juno USA, LP and affiliated debtors and debtors in possession (collectively, the "**Debtors**"), by and through their *proposed* counsel, Chipman Brown Cicero & Cole, LLP, hereby file this motion (the "**Motion**"), pursuant to sections 105(a), 362, 364(c)(2), 364(d) and 507 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**"), and a final order (the "**Final Order**," and the Final Order together with the Interim Order, the "**DIP Orders**") (a) authorizing the Debtor, as borrower, to obtain secured postpetition financing (the "**DIP Financing**" or the "**DIP Facility**") pursuant to that certain *Senior Secured Superpriority Debtor-in-Possession Financing Term Sheet* (the "**DIP Term Sheet**[2]," and with the DIP Orders, the "**DIP**

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Juno USA, LP (5772); Sabo One LLC (2759); Juno Oregon LLC (4462); Vulcan Cars LLC (4733); GT Forge, Inc. (1093); and Omaha LLC (8656).  The mailing address for the Debtors listed above is 74 West Long Lake Road, Suite 205, Bloomfield Hills, Michigan 48304.

[2]   A copy of the DIP Term Sheet is attached to the Interim Order as **Exhibit 1**.

**Facility Documents**"), (b) authorizing the use of Cash Collateral (*as defined below*), (c) modifying the automatic stay, (d) scheduling a final hearing (the **"Final Hearing"**), and (e) granting related relief.   In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Melissa S. Kibler in Support of First Day Pleadings* (the "**First Day Declaration**") filed with the Court concurrently with this Motion.  In further support of the Motion, the Debtors respectfully represent as follows:

**JURISDICTION**

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over these Chapter 11 Cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Pursuant to Local Rule 9013-1(f) the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      Venue of these cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in the Motion are sections 105(a), 362, 364(c)(2), 364(d) and 507 of the Bankruptcy Code.  The relief is also appropriate under Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 and Local Rules 4001-2 and 9013-1.

**BACKGROUND**

4.      On the date hereof (the "**Petition Date**"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").

5.      The Debtors continue to oversee their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' Chapter 11 Cases.  No date has been set for a meeting pursuant to section 341 of the Bankruptcy Code.

6.      Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these Chapter 11 Cases is set forth in detail in the First Day Declaration, which is incorporated in this Motion by reference.

## DEBTOR'S CAPITAL STRUCTURE

7.      Prior to the Petition Date, the Debtors' operations were funded on an unsecured basis by GT Gettaxi Limited (the "**Parent**" or the "**DIP Lender**") through intercompany transfers.[3] Sberbank Investments ("**Sberbank**"), as Security Agent, holds a perfected, first-priority all asset lien against Debtor GT Forge, Inc. (**"GT Forge"**), which is based on a secured guaranty granted by GT Forge, including its partnership interest in Debtor Juno USA, LP (**"Juno"**), in connection with the Parent's secured financing facility (the "**Sberbank Lien**").  In addition, Juno maintains a money market account at Citibank, which collateralizes two letters of credit covering Juno's corporate leases in Manhattan and Portland, Oregon (the "**LCs**").  The Debtors have no other secured financing obligations.

8.      With respect to the Sberbank Lien, the Debtors believe that Sberbank will consent to having its lien in the assets of Debtor GT Forge primed by the proposed DIP Financing.

---

[3]   The Parent previously held a first-priority perfected, all asset lien against Debtors Juno USA, LP and Vulcan Cars LLC (the "**Parent Liens**").  In 2017, the loan underlying the Parent Liens was converted to equity.  Accordingly, the Parent Liens were terminated and released.

Sberbank has also consented to the Debtors' use of its Cash Collateral at GT Forge. The other Debtors' Cash Collateral is otherwise unencumbered. Finally, the LCs will be carved out from the DIP Lender's Collateral (*as defined below*).

## ALTERNATIVE FINANCING EFFORTS

9.     Prior to the Petition Date, Mackinac Partners, LLC ("**Mackinac**"), the Debtors' restructuring advisor and Melissa S. Kibler ("**Ms. Kibler**"), the Debtors' Chief Restructuring Officer (the "**CRO**"), evaluated options for obtaining unsecured debtor in possession financing ("**DIP**") or alternative DIP financing. Given that (a) the Debtors have few assets other than the tax assets held by Debtor GT Forge , which cannot be sold to or used by any other entity or party, (b) the Debtors have ceased all of their "business-to-consumer" ("**B2C**") operations and have no future revenue stream, and (c) Sberbank has a first-priority lien against all of GT Forge' assets , including its partnership interest in Juno, Mackinac determined that it is highly unlikely that the Debtors would be able to obtain DIP financing on an unsecured or secured basis from any another source. None the less, prior to the Petition Date, Mackinac solicited several distressed lenders and received no indications of interest with respect to financing the Debtors during these Chapter 11 Cases.

10.     Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP Financing was the best available under the circumstances and adequately addresses the Debtors' financing needs during these Chapter 11 Cases. Importantly, the DIP Financing was negotiated at arms'-length by the proposed DIP Lender, the Debtors' proposed counsel, and the CRO, and was vetted and approved by David Eaton, the Debtors' independent director (the "**Independent Director**").

11.     The DIP Financing is necessary to effectuate the Debtors' goals in these Chapter 11 Cases and beyond.  As set forth in more detail in the First Day Declaration, the Debtors are seeking to liquidate their B2C operations.  To this end, GT Forge intends to develop strategic partnerships with certain competitors in the ride-hailing space and, through this restructuring process, intends to emerge as a member of a leading global "business-to-business" ("**B2B**") transportation network company.

## RELIEF REQUESTED

12.     By this Motion, the Debtors seek entry of the DIP Orders (a) authorizing the Debtors to borrow funds under the DIP Facility in an aggregate principal amount of up to $1,000,000.00 on an interim basis[4] and up to $4.5 million on a final basis (collectively, the "**DIP Loans**"), pursuant to the terms and conditions of the DIP Term Sheet; (b) modifying the automatic stay to the extent necessary to grant the DIP Lender the security interests, liens, and secured claims set forth under the DIP Facility; (c) authorizing the Debtors' use of Cash Collateral (*as defined below*); (d) scheduling the Final Hearing, and (e) granting related relief.

## SUMMARY OF PRINCIPAL TERMS OF THE DIP FACILITY[5]

13.     Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following is a concise summary of the proposed material terms of the DIP Facility and the DIP Term Sheet.

| | |
|---|---|
| **Borrower** | Juno USA, LP, as a debtor and debtor in possession in the Chapter 11 Cases (the "**Borrower**"). |

---

[4]   While the Debtors believe that they will have sufficient cash to fund much of their efforts for the first four weeks of these Chapter 11 Cases, the Debtors are requesting access of up to $1,000,000 of the DIP Loans on an interim basis out of an abundance of caution, in the event the filing of these cases negatively impacts the timing of the receipt of certain accounts receivable.

[5]   The below is intended to be a summary only and the terms of the DIP Term Sheet and the DIP Facility Documents control in all respects.  Capitalized terms set forth in this summary shall have the meaning ascribed to them in the DIP Term Sheet.

| | |
|---|---|
| **Guarantors** | Debtors other than the Borrower.<br><br>The Borrower and Guarantors are collectively referred to herein as the "**Loan Parties**." |
| **DIP Administrative Agent** | N/A |
| **DIP Lender** | GT Gettaxi Limited or an affiliate entity thereof (the "**DIP Lender**"). |
| **DIP Facility/Borrowing Limits**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Facility shall comprise a term loan (in an aggregate principal amount of up to $4.5 million (the **"Commitment"**).<br><br>An initial amount of $1,000,000.00 will be made available upon entry of an Interim Order, in form and substance satisfactory to the DIP Lender in its sole discretion, approving the DIP Financing.  The remainder of the facility will be made available subject to entry of the Final Order, in form and substance satisfactory to the DIP Lender in its sole discretion, approving the DIP Facility on a final basis.<br><br>The DIP Facility is provided for the purposes listed under "**Use of Proceeds**" below in accordance with the Approved Budget (*as defined below*). |
| **Interest Rate**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | All amounts outstanding under the DIP Facility will PIK interest at a fixed rate equivalent to the LIBOR Rate plus 8% per annum, which fixed rate shall be determined as of the DIP Closing Date (*as defined below*)<br><br>As used herein, the term "**LIBOR Rate**" will have meaning customary and appropriate for financings of this type, and the basis for calculating accrued interest and the interest periods for loans bearing interest at the LIBOR Rate will be customary and appropriate for financings of this type; *provided that* in no event will the LIBOR Rate be less than 1.50%.<br><br>During the continuance of an Event of Default, the DIP Loans and all other outstanding obligations will bear interest at an additional 1% per annum above the interest rate otherwise applicable. |
| **Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | N/A |

| | |
|---|---|
| **Budget**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The 13-week statement of receipts and disbursements for the next 13 weeks of the Loan Parties, broken down by week, including the anticipated uses of the DIP Facility for such period ("**Approved Budget**"), and thereafter at the end of each week an updated 13-week projection for the subsequent 13-week period (which in each case must be satisfactory to the Lender in its sole discretion). A copy of the Approved Budget is attached to the Interim Order as **Exhibit 2**.<br><br>The DIP Loans shall be funded into a cash collateral account at a depository approved by the DIP Lender, and the amounts in the account that may be drawn out during each week will be limited to the maximum amount of DIP Loans projected to be utilized during such week in accordance with the Approved Budget.<br><br>The Debtors shall provide a budget variance report/reconciliation (the "**Budget Variance Report**") by 12:00 p.m. *prevailing* Eastern Time on Wednesday of each week for the week most recently ended: (i) showing by line item actual cash receipts, disbursements, professional fees, capital expenditures, and billings for the immediately preceding week, the immediately preceding rolling four-week, cumulative period on and after the entry of the Interim Order, noting therein all variance, on a line-item basis, from amounts set forth for such period in the Approved Budget, and shall include explanations for all material variance for such week; and (ii) certified by a responsible officer of the Debtors. |
| **Closing Date**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The date on or after the entry of the Interim Order on which the "**Conditions to DIP Closing**" described in Appendix I to the DIP Term Sheet (excluding "**Conditions to Final Loan**") have been satisfied or waived by the Lender (the date of such closing, the "**DIP Closing Date**"). |
| **Conditions Precedent to the Initial Extension of Credit and Each Loan**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | (i)    The Chapter 11 Cases shall have been commenced in the Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the DIP Lender;<br><br>(ii)    The Bankruptcy Court shall have entered an Interim Order as to the DIP Facility (and no appeal thereof shall have been filed or remain pending) which Interim Order shall be in form and substance satisfactory in the sole discretion of the Lender and shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge; and |

| | |
|---|---|
| | (iii) All orders entered by the Bankruptcy Court, including orders pertaining to cash management, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the DIP Lender, be in full force and effect, and shall not (in whole or in part) have been reversed, modified, stayed or vacated absent prior written consent of the DIP Lender. |
| **Maturity**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Loans shall be repaid in full, and the Commitment shall terminate, on the earliest to occur (the "**Maturity Date**") of (i) the date that is 45 days after entry of the Interim Order by the Bankruptcy Court, if Final Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Loan Parties to a Chapter 7 liquidation or the dismissal of the bankruptcy case of any Loan Party, (iii) the acceleration of the DIP Loans and the termination of the Commitment under the DIP Facility, (iv) the sale of all or substantially all of the Loan Parties' assets, and (v) the effective date of the joint plans of reorganization and liquidation for the Loan Parties. |
| **Collateral**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The assets described below under DIP Liens/Superpriority Administrative Claim Status, collectively, the "**Collateral**." |
| **DIP Liens/Superpriority Administrative Claim Status**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | All obligations under the DIP Facility, subject to the Carve-Out (*as defined below*), shall at all times:<br><br>(i) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status having priority over any and all other claims;<br><br>(ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first-priority lien on all unencumbered now-owned or after-acquired Property (*as defined below*) of the Loan Parties that are not otherwise subject to any lien; and<br><br>(iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all now-owned or after-acquired Property of the Loan Parties that are subject to (x) any valid, perfected and non-avoidable lien in existence on the Filing Date, or (y) any valid lien in existence on the Filing Date |

that is perfected subsequent to the Filing Date by Section 564(b) of the Bankruptcy Code.

(iv) pursuant to Section 364(d) of the Bankruptcy Code, be secured by a perfected priming lien on all now-owned or after-acquired Property of the Loan Parties, including Sberbank's first-priority lien against all of GT Forge' assets, subject to (x) any valid, perfected and non-avoidable lien in existence on the Filing Date, or (y) any valid lien in existence on the Filing Date that is perfected subsequent to the Filing Date by Section 564(b) of the Bankruptcy Code.

"Collateral" or "Property" shall mean, with respect to any of the Loan Parties, all real and personal property of such Loan Party including, without limitation, (i) all cash, money, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, goods and inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles of any kind, rights to the payment of money, supporting obligations, guarantees, general intangibles, letter of credit rights, other than the LCs, commercial tort claims, causes of action and all substitutions, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (ii) all owned real property, all leased real property, all rents and leases from any real property interests, and all other proceeds of real property; (iii) subject to the entry of a Final Order, avoidance actions brought pursuant to claims and causes of actions under Sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553, 732(2) or 742(2) of the Bankruptcy Code; (iv) subject to the entry of a Final Order, rights under Section 506(c) of the Bankruptcy Code and (v) all proceeds of the foregoing.  For the avoidance of doubt, the DIP Collateral shall include all the foregoing rights, property, claims, and interests, without regard as to whether such rights, property, claims, and interests came into the Loan Parties' estates, or otherwise arose, after the Filing Date.

All of the liens described herein (collectively, the "**DIP Liens**") with respect to the assets of the Loan Parties shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

| | |
|---|---|
| **Prepayments**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Loans may be permanently prepaid in full by the Loan Parties at any time. |
| **DIP Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The Loan Parties shall achieve the following milestones (the "**Milestones**"):<br><br>(i)  commencement of the Chapter 11 Cases (the "**Filing Date**") no later than November 19, 2019;<br><br>(ii)  filing with the Bankruptcy Court the non-consolidated, joint prearranged plans of reorganization and liquidation of the Loan Parties in form and substance reasonably acceptable to the DIP Lender (the "**Plan**") and disclosure statement ("**Disclosure Statement**") within twenty (20) business days of the Filing Date;<br><br>(iii)  obtaining entry of a Bankruptcy Court order, in form and substance satisfactory to the DIP Lender, approving the Disclosure Statement within eighty (80) days of the Filing Date;<br><br>(iv)  obtaining entry of a Bankruptcy Court order, in form and substance satisfactory to the DIP Lender, confirming the Plan within one hundred and twenty (120) days of the Filing Date; and<br><br>(v)  the effective date of the Plan shall be within ten (10) days of entry of an order confirming the Plan, and in any event, no more than one hundred and thirty (130) days following the Filing Date. |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Facility shall contain events of default customary or appropriate in the context of the proposed DIP Facility or as otherwise required by the Lender (the "**Events of Default**"), including, without limitation: (i) any amendment, supplement or other modification to the Loan Parties' Plan, without the consent of the DIP Lender; (ii) the entry of an order approving any disclosure statement in support of a plan of reorganization and/or liquidation other than the Plan unless consented to by the DIP Lender; (iii) the violation of any term, provision or condition in the Interim Order or Final Order; (iv) dismissal of the Chapter 11 Cases; (v) entry of a judgment or order by the Bankruptcy Court or any other court modifying, limiting, subordinating, re-characterizing, or avoiding the validity, enforceability, perfection, or priority of any of the Loan Parties' obligations under the DIP Facility or the liens securing the DIP Facility (or any invalidation or impairment of liens or security interests of the |

| | |
|---|---|
| | DIP Lender shall otherwise occur), or, subject to entry of the Final Order, imposing, surcharging or assessing against the DIP Lender's interest in the Collateral, any costs or expenses, whether pursuant to sections 506(c) or 552 of the Bankruptcy Code; (vi) the making of any payment or disbursement that is not set forth as a line item on the Approved Budget; and (vii) failure to satisfy any Milestones. |
| **Parties with an Interest in Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | Sberbank Investments, as Security Agent, holds a perfected, first-priority all asset lien against Debtor GT Forge.  Sberbank has consented to the use of Debtor GT Forge's cash Collateral.  No other party has an interest in the Debtors' cash collateral. |
| **Purposes for Use of DIP Proceeds**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* | Subject to the terms and conditions herein, the proceeds of DIP Facility will be used in accordance with the terms of the Approved Budget, including, without limitation, to fund the (i) administration of the Chapter 11 Cases, (ii) orderly winding down of operations and liquidation of the assets of the Liquidating Debtors, (iii) Reorganizing Debtor's business in the ordinary course during the Chapter 11 Cases, (iv) payment of the DIP Lenders' fees and expenses, and (v) payment of Administrative Expense Claims (including professional fee claims and 503(b)(9) claims), Priority Tax Claims and Other Priority Claims (each such term as defined in the Approved Plan).<br><br>No portion of the Borrowers' cash collateral and other cash (collectively, the "**Cash Collateral**"), the DIP Loans, the Collateral or the Carve-Out may be used to investigate, commence or prosecute any action, proceeding or objection with respect to or related to the claims, liens or security interests of the DIP Lender. |
| **Carve-Out**<br><br>*Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii)* | The Carve Out is the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors or the Committee pursuant to Sections 327, 328, 363 or 1103 of the Bankruptcy Code (the "**Retained Professionals**") at any time before or on the first business day following delivery by the Lender of a Carve Out Trigger Notice (*as defined below*), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Retained Professionals in an aggregate amount not to exceed $50,000.00 incurred after the first business day following delivery by Lender of the Carve Out Trigger |

| | |
|---|---|
| | Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice (including  email or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee and any Committee appointed in these Chapter 11 Cases, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **Modification of Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay shall be modified as necessary to effectuate all of the terms and provisions of the Interim Order and Final Order, including, without limitation, to permit the Debtors to grant the DIP Liens. |
| **Section 506(c) Waiver**<br><br>*Local Rule 4001-2(a)(i)(C)* | Subject to the entry of the Final Order, in light of the Budget covering all administrative costs projected by the Debtors, the DIP Lender is entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.<br><br>The entry of a final, non-appealable order in the Debtors' Chapter 11 Cases charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Lender shall be an event of default. |
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Loan Parties shall, jointly and severally, be obligated to indemnify and hold harmless the DIP Lender, and its officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in the DIP Term Sheet. |
| **Liens on Avoidance Actions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi)* | Subject to entry of a Final Order, the obligations of the Debtors under the DIP Facility shall, subject to the Carve-Out, at all times pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected, first priority security interest and lien on the proceeds of Avoidance Actions. |

| | |
|---|---|
| **Waiver of Marshaling Doctrine and Equities of Case Exception**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | Upon entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral. |

## **HIGHLIGHTED PROVISIONS UNDER LOCAL RULE 4001-2(A)(1)**

14.     The Interim Order includes certain terms that constitute material provisions requiring explicit disclosure under the Local Rules.  The provisions described in Local Rule 4001-2(a)(i), to the extent applicable, are set in the following sections of the Interim Order:

a.     **Local Rule 4001-2(a)(i)(A) – Cross Collateralization.**  The Interim Order provides for the guaranty of the DIP Obligations by all of the Debtors, at paragraph 3.

b.     **Local Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount Prepetition Liens.**  The Interim Order contains no provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection, or amount of any prepetition liens.

c.     **Local Rule 4001-2(a)(i)(C) – Section 506(c) Waiver.**  With respect to expenses incurred prior to the Final Hearing, the Interim Order contains a waiver of any right to asset claims or to surcharge against the Collateral.  *See* Interim Order, at paragraph 28.

d.     **Local Rule 4001-2(a)(i)(D) – Liens on Avoidance Actions.**  Subject to the entry of the Final Order, the obligations of the Debtors under the DIP Facility shall, subject to the Carve-Out, at all times pursuant to section 364(c)(2) and 364(d) of the Bankruptcy Code, be secured by a priming perfected, first priority security interest and lien on the proceeds of Avoidance Actions.  *See* Interim Order, at paragraph 8.

e.     **Local Rule 4001-2(a)(i)(E) – Provisions Deeming Prepetition Debt to be Postpetition Debt.**  The Interim Order contains no provisions that deem prepetition debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt.

f.   **Local Rule 4001-2(a)(i)(F) – Disparate Treatment of Professionals Retained by the Committee.** The Interim Order contains no provisions that provide for disparate treatment of professionals retained by a Creditors' Committee, if any, with respect to the Carve-Out.

g.   **Local Rule 4001-2(a)(i)(G) – Non-Consensual Priming.** As described above, the Debtors believe that Sberbank will consent to have the Sberbank Lien being primed and the LCs have been carved out of the DIP Collateral.

h.   **Local Rule 4001-2(a)(i)(H) – Provisions Affecting the Court's Power to Consider Equities of the Case.** Upon entry of the Final Order, the DIP Lenders shall not be subject to the equities of the case under section 552(b) of the Bankruptcy Code, the equitable doctrine of "marshaling," or any other similar doctrine with respect to any of the Collateral. *See* Interim Order, at paragraph 26.

## BASIS FOR RELIEF

**I.    THE DIP FACILITY SHOULD BE APPROVED.**

### A.   Entering into the DIP Financing Documents Is an Exercise of the Debtor's Sound Business Judgment.

15.    The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Facility Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases permit reasonable

business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

16.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

17.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm.  Mobil Oil Corp.  v. First Nat'l Bank & Trust Co.  (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the debtor offered by a proposed postpetition facility.

18.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms' length process and careful evaluation of their lack of alternatives.  Specifically, and in the face of limited cash on hand, the Debtors and their advisors determined that the Debtors will require significant postpetition financing to support its operational restructuring and liquidation activities.  The DIP Lender was the only party willing to

provide financing to the Debtors.  Accordingly, the Debtors negotiated the DIP Facility Documents with the DIP Lender in good faith, at arms' length, and with the assistance of its advisors.  The Debtors believe that they have obtained the best and only financing available.  Entry into the DIP Facility is in the best interests of the Debtors' estates and is an exercise of the Debtors' sound business judgment and should be approved.

### B.    The Debtors are authorized to Incur the DIP Obligations Under Section 364(c)(2) of the Bankruptcy Code.

19.    The Debtors propose to obtain financing under the proposed DIP Facility by providing security interests and liens as set forth above pursuant to section 364(c)(2) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c); *see Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing); *In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under § 364(c)(2) was authorized, after notice and a hearing, upon showing that unsecured credit was unobtainable); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking credit under section 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

20.    Where, as is case here, a debtor is unable to obtain unsecured credit, section 364(c)(2) of the Bankruptcy Code provides that a debtor may obtain credit "secured by a lien on property of the estate that is not otherwise subject to a lien."  11 U.S.C. § 364(c)(2).  In addition

to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the prepetition secured parties have consented or (b) the prepetition secured parties' interests in collateral are adequately protected. As of the Petition Date, the Collateral is not encumbered by any secured liens other than the Sberbank Lien at GT Forge, which Sberbank has agreed to subordinate to the DIP Loans. Further, as described above, the Debtors were unable to obtain unsecured credit or postpetition financing on a junior basis under section 364(c)(3) of the Bankruptcy Code. Finally, as set forth in further detail in the First Day Declaration, the Debtors have determined to liquidate all operations relating to their B2C business line and intend to reorganize around Debtor GT Forge to focus on the B2B market post emergence from chapter 11. Through these Chapter 11 Cases, the Debtors intend to liquidate all pending litigation claims and efficiently and properly wind down their B2C operations. The Debtors' require the DIP Financing to achieve these goals through chapter 11 and to pay all administrative expenses and confirm their Plan. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Facility Documents, are fair, reasonable, and adequate, all as more fully set forth herein.

**C.      The DIP Financing is Necessary to Preserve the Value of the Debtors' Estates.**

21.      The Debtors have liquidity needs and require financing to fund the administration of the bankruptcy cases.  Among the Debtors' most valuable assets are certain tax attributes at Debtor GT Forge.  As noted in the First Day Declaration, the Debtors intend to wind down their B2C operations and reorganize around GT Forge, emerging with their tax attributes intact and poised to commence reentry into the market as a global B2B provider.  In addition, through the Chapter 11 Cases, the Debtors will work to recover assets of the estates, including the return of equipment from drivers, will liquidate all remaining assets of the Liquidating Debtors, and resolve all claims in an efficient and cost-effective manner.

22.      The Debtors require access to the DIP Facility to be able to continue to operate GT Forge and pay their administrative expenses as they become due.  This relief will enable the Debtors to restructure their business in a manner that will permit it to preserve and maximize value for all parties in interest and avoid immediate and irreparable harm.

**D.      The Terms of the DIP Financing are Fair, Reasonable, and Appropriate.**

23.      After appropriate investigation and analysis, the Debtors have concluded that the DIP Financing presents the best route available under the circumstances.  Bankruptcy courts routinely defer to a debtor's business judgment on substantive business decisions, including the decision to borrow money, unless such decisions fail the arbitrary and capricious standard.  *See Ames*, 115 B.R. at 40 (court should approve borrowings pursuant to § 364(c) and (d) if the debtor was within its business judgment); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58–59 (Bankr. N.D.N.Y. 2005) (same); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of an interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgement… [was] reasonable under the circumstances

and in the best interest of [the debtor] and its creditors."). Indeed, "more exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interference with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (*citations omitted*).

24.    The terms and conditions of the DIP Financing are fair and reasonable.  As discussed above, the Debtors properly assessed their financing needs and the DIP Financing proposal, and in the sound exercise of the Debtors' business judgment, the DIP Financing represents the best option available under the circumstances.  The DIP Lender has agreed to provide no-fee DIP Financing on extremely favorable terms that are below or at market.  The Debtors' advisors, the CRO, and the Independent Director, on the one hand, and the DIP Lender on the other hand, negotiated the terms of the DIP Financing.  The outcome of those negotiations resulted in, among other things, a lower PIK interest rate, more favorable milestones, a revised maturity date and a higher facility amount.  The DIP Lender has also agreed to provide exit financing to further assist the Debtors in achieving their pre- and post-emergence goals.  Therefore, the Debtors decided to accept the DIP Financing with the DIP Lender.

25.    The proposed DIP Financing subjects the security interests and secured claims of the DIP Lender to the Carve-Out, thereby ensuring that, in the event of a default under the DIP Term Sheet, the Debtors' estates and other parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in this case.  In *Ames*, the Court found such carve-outs for professional fees not only reasonable, but necessary to ensure that official committees and the debtors' estate could retain assistance from

counsel.  *See Ames*, 115 B.R. at 38–40 ("Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

26.    Further, the negotiated DIP Milestones are a crucial element of the terms of the DIP Financing, and their inclusion in the Interim Order is important to ensure that the Chapter 11 Cases proceed in a strategic, value-maximizing fashion.  In similar contexts, this Court has entered interim financing orders that included express milestones for the progress of a debtor's case. *See, e.g.*, *In re Horsehead Holding*, Case No. 16-10287 (CSS) (Bankr. D. Del. Feb. 4, 2016) [Docket No.81] (approving case milestones in the interim DIP financing order); *In re Verso Corp.*, Case No. 16-10163 (KG) (Bankr. D. Del. Jan. 27, 2016) [Docket No.105] (same); *In re Cal Dive Int'l*, Case No. 15-10458 (CSS) (Bankr. D. Del. Mar. 9, 2015) [Docket No.74] (same); *In re ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.)*, Case No. 14-12092 (KJC) (Bankr. D. Del. Sept. 10, 2014) [Docket No.58] (same); *In re Handy Hardware Wholesale, Inc.*, Case No. 13-10060 (MFW) (Bankr. D. Del. Jan. 14, 2013) (same).[6]

27.    Finally, this Court has previously approved DIP facilities where the parties to the financing had entered into a binding term sheet rather than a full credit agreement.  *See, e.g.*, *Consolidated Infrastructure Group, Inc.*, Case No. 19-10165 (BLS) (Bankr. D. Del. Jan. 31, 2019); *In re Alcor Energy, LLC*, Case No. 18-12839 (CSS) (Bankr. D. Del. Dec. 21, 2018) [Docket No.27] (authorizing DIP financing pursuant to a binding term sheet); *In re ABT Molecular Imaging, Inc.*, Case No. 18-11398 (LSS) Bankr. D. Del. June 15, 2018) [Docket No.33] (same); *In re Outer Harbor Terminal, LLC*, Case No. 16-10283 (LSS) (Bankr. D. Del. Feb. 9, 2016) [Docket No.52].

---

[6]    The referenced orders are voluminous in nature and are not attached to this Motion.  However, in light of the requirements of Local Rule 7007-2(a)(vii), undersigned counsel has retained copies of each order and will make them available to the Court, if requested, or to any party that requests them.

Thus, for these reasons and the reasons set forth above, the DIP Facility on the terms set forth in the DIP Term Sheet should be approved.

### E.    The Use of Cash Collateral is Appropriate.

28.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) provides that:

> The trustee may not use, sell or lease cash collateral… unless—
>
> (A)    each entity that has an interest in such collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.

29.    Prior to the Petition Date, the Debtors' Cash Collateral was largely unencumbered, however, GT Forge's cash, including, without limitation, all cash and other amounts on deposit or maintained by GT Forge as well as any cash proceeds derived from the disposition of any of GT Forge's Collateral, constitute proceeds of GT Forge's Collateral and, therefore are cash collateral of Sberbank within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

30.    Prior to the Petition Date, the company relied on cash on hand, cash generated from their operations, and cash provided by the Parent, to fund working capital, capital expenditures, and for other general corporate purposes. During these Chapter 11 Cases, the Debtors will need access to their Cash Collateral to satisfy employee, tax, and other administrative obligations, as well as to make any other payments that are essential for the orderly wind down of the Debtors' B2C business and to effectuate the Debtors' chapter 11 goals.  An inability to use funds during these Chapter 11 Cases could severely impact the success of these Chapter 11 Cases.  Indeed,

without access to Cash Collateral, the Debtors and their estates will suffer immediate and irreparable harm.

31.    As set forth above, prior to the Petition Date, the Debtors' Cash Collateral was largely unencumbered, however, Sberbank holds an all-asset lien against GT Forge's assets.  The Debtor believes that Sberbank will consented to the Debtors' use of its Cash Collateral as well as to being primed by the DIP Financing.  Accordingly, the Debtors respectfully submit that the use of Cash Collateral is fully consensual, is in the best interests of the Debtors' estates and should be approved.

**F.    Modification of the Automatic Stay is Appropriate.**

32.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Facility Documents require a modification of the automatic stay to implement the terms of the DIP Financing.

33.    Stay modification provisions of this kind are ordinary and standard features of postpetition DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available.  Further, the Debtors have not been able to obtain DIP financing on terms more favorable than those proposed herein.  The terms and conditions of the DIP Financing, including the modification of stay provisions, are fair and reasonable, and were negotiated in good faith and at arms' length by parties represented by sophisticated counsel. Accordingly, in light of the circumstances and the material benefits afforded to the Debtors by the DIP Financing, the modification of the automatic stay is warranted and appropriate.

G.      **A Final Hearing Should be Set.**

34.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing as soon as practicable, but in no event later than thirty (30) days following the Petition Date.

35.     The Debtors request authorization to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties set forth below.  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

H.      **The Requirements of Bankruptcy Rule 6003 are Satisfied.**

36.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one (21) days after the petition date "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, authorizing the Debtors to obtain postpetition secured financing under the DIP Facility and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim Order and the DIP Facility, as well as granting the other relief requested herein, is integral to the Debtors' ability to wind down their B2C operations and focus on restructuring around GT Forge with a focus on the B2B market.  Failure to receive such authorization during the first twenty-one (21) days of these Chapter 11 Cases would severely hamper the Debtors' ability to ensure a smooth entry into chapter 11 at this critical juncture, destroying value and irreparably harming all parties in interest.

37.     For the reasons discussed herein, this relief is necessary in order for the Debtors to maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### I.     Bankruptcy Rule 6004(a) Should be Waived.

38.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a).

39.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent potentially irreparable damage to the Debtors.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## RESERVATION OF RIGHTS

40.     Nothing contained herein is, is intended to be, or should be construed as an admission regarding the validity of any claim against the Debtors, a waiver of the Debtors' right to dispute any claim, or an approval or assumption of any agreement, contract, or policy under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, should the Court grant the relief sought herein, any payment made pursuant to an order of the Court is not, is not intended to be, and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

41.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the parties included on the Debtors' consolidated list of twenty (20) largest unsecured creditors; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) Sberbank and its counsel; (vii) counsel to the proposed DIP Lender; and (viii) all known holders of liens in the Debtors' assets; (ix) the Debtors' landlords.  As this Motion is seeking "first day" relief, notice of this Motion and any order entered in connection with the Motion will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

**WHEREFORE**, the Debtors respectfully request that the Court enter: (i) the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein on an interim basis; (ii) the Final Order granting the relief requested herein on a final basis; and (iii) grant such other and further relief as the Court may deem just and proper.

Dated: November 19, 2019  
       Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ William E. Chipman, Jr.*

William E. Chipman, Jr. (No. 3818)  
Mark L. Desgrosseilliers (No. 4083)  
Mark D. Olivere (No. 4291)  
Hercules Plaza  
1313 North Market Street, Suite 5400  
Wilmington, Delaware 19801  
Telephone:    (302) 295-0191  
Facsimile:    (302) 295-0199  
Email:       chipman@chipmanbrown.com  
              desgross@chipmanbrown.com  
              olivere@chipmanbrown.com

*Proposed Counsel to the Debtors and Debtors-In-Possession*

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JUNO USA, LP, *et al.*,[1] | Case No. 19-12484 (MFW) |
| Debtors. | (*Joint Administration Requested*) |

## *INTERIM* ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

This matter coming before the Court upon the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (the "**Motion**"),[2] pursuant to sections 105(a), 362, 364(c)(2), 364(d) and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 4001-2 and 9013-1, seeking entry of an Interim Order and a Final Order (collectively, "**DIP Orders**") (a) authorizing the Debtor, as borrower, to obtain secured postpetition financing (the "**DIP Financing**" or the "**DIP Facility**") from GT Gettaxi Limited (the "**DIP Lender**") pursuant to that certain *Senior Secured Superpriority Debtor-in-Possession Financing Term Sheet* (the "**DIP Term Sheet**[3]," and with the DIP Orders, the "**DIP Facility Documents**"), (b) authorizing the use of Cash Collateral, (c) modifying the automatic stay, (d) scheduling a final hearing (the "**Final Hearing**"), and (e)

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Juno USA, LP (5772); Sabo One LLC (2759); Juno Oregon LLC (4462); Vulcan Cars LLC (4733); GT Forge, Inc. (1093); and Omaha LLC (8656).  The mailing address for the Debtors listed above is 74 West Long Lake Road, Suite 205, Bloomfield Hills, Michigan 48304.

[2]   Capitalized terms used but not defined specifically in this Interim Order shall have the meanings ascribed to them in the Motion.

[3]   A copy of the DIP Term Sheet is attached hereto as **Exhibit 1**.

granting related relief; and upon consideration of the First Day Declaration; and this Court having

found that (i) this Court has jurisdiction to consider the Motion and the relief requested therein

under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United*

*States District Court for the District of Delaware*, dated February 29, 2012, (ii) this Court may

enter a final order consistent with Article III of the United States Constitution, (iii) this is a core

proceeding under 28 U.S.C. § 157(b)(2)(A), (iv) venue of this proceeding and the Motion in this

District is proper under 28 U.S.C. §§ 1408 and 1409, and (v) the Debtors' notice of the Motion

and opportunity for a hearing were adequate and appropriate under the circumstances; and this

Court having reviewed the Motion; and this Court having determined that the legal and factual

bases set forth in the Motion and the First Day Declaration establish just cause for the relief granted

herein; and this Court having found and determined that the relief sought in the Motion is in the

best interests of the Debtors' estates, their creditors and other parties in interest; and after due

deliberation and sufficient cause appearing therefor,

**NOW, THEREFORE, IT IS HEREBY FOUND AND CONCLUDED THAT:**

A. <u>Petition Date</u>: On November 12, 2019, each of the Debtors filed a voluntary

petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

District of Delaware (the "**Court**"), commencing these chapter 11 cases.

B. <u>Debtor in Possession</u>: The Debtors are continuing in the management of their

businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

C. <u>Committee Formation</u>: As of the date hereof, the Office of the United States Trustee

for the District of Delaware (the "**U.S. Trustee**") has not appointed any statutory committee (each

a "**Committee**") in these Chapter 11 Cases.

- 2 -

D.      Findings Regarding Postpetition Financing and Use of Cash Collateral:

i.  *Good Cause*.   Good cause has been shown for the entry of this Interim Order.

ii.  *Request for Postpetition Financing and Use of Cash Collateral*.   The Debtors seek authority to borrow funds under the DIP Facility Documents.   The DIP Lender shall have no obligation to make loans or advances under the DIP Facility except to the extent required under the DIP Facility Documents and shall have no obligation to waive any conditions required thereunder.   The Debtors also seek authority to use Cash Collateral on the terms described herein, and in accordance with the Approved Budget, attached hereto as **Exhibit 2**, (the "**Approved Budget**") to administer these Chapter 11 Cases and fund the Debtors' restructuring efforts.

iii.  *Need for Postpetition Financing and Use of Cash Collateral*.   The Debtors' need to use Cash Collateral and obtain credit as set forth in the DIP Term Sheet is immediate and critical in order to enable the Debtors to swiftly and efficiently liquidate their B2C operations and reorganize around Debtor GT Forge, Inc.   The absence of immediate access to funds under the DIP Facility would immediately and irreparably harm the Debtors, their estates and their creditors.   The Debtors do not have sufficient available sources of working capital and financing to effectuate their strategic chapter 11 goals and pay all administrative expenses.   Consummating the financing contemplated by the DIP Term Sheet pursuant to the terms of this Interim Order therefore is in the best interest of the Debtors, their estates, and stakeholders.

iv.  *No Credit Available on More Favorable Terms*.   Based on the representations in the First Day Declaration, the record of the hearing on the Motion (the

- 3 -

"**Interim Hearing**"), given the Debtors' financial condition and capital structure: (i) the Debtors are unable to reasonably obtain postpetition financing from sources other than the DIP Lender on terms more favorable than those set forth in the DIP Facility Documents; (ii) the Debtors have been unable to reasonably obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense; (iii) alternative postpetition secured financing was not available to the Debtors; and (iv) the DIP Lender is unwilling to extend DIP Financing without being granted perfected security interests in, and liens on (each as provided herein), all of the Debtors' existing and after-acquired assets with the priorities set forth herein and the other protections set forth in this Interim Order.

     v.   *Use of Proceeds.*

       a.  As a condition to entry into the DIP Facility Documents and the extension of credit under the DIP Facility, the DIP Lender requires, and the Debtors have agreed, that proceeds of the DIP Facility shall be used in accordance with the terms of the DIP Facility Documents, including the Approved Budget, attached hereto as **Exhibit 2**, which shall be subject to (x) reasonable variances, permitted by the DIP Lender (the "**Permitted Variance**"), (y) this Interim Order (or the Final Order as applicable), and (z) the Carve-Out.

       b.  The Debtors shall not directly or indirectly pay any expense or other disbursement other than those set forth in the Approved Budget (other than expenses with respect to the Carve-Out) unless in compliance with the Permitted Variance or otherwise permitted or directed by an order of the Court.

       c.  The proceeds of the DIP Facility shall be used solely as provided in the DIP Term Sheet, including, to the extent provided therein, to fund the (i) administration of the Chapter 11 Cases, (ii) orderly winding down of operations and liquidation of the assets of the Liquidating Debtors, (iii) Reorganizing Debtor's business in the ordinary course during the Chapter 11 Cases, and (iv) payment of Administrative Expense Claims (including professional fee claims and 503(b)(9) claims), Priority Tax Claims, and Other Priority Claims (as such terms are defined in the Approved Plan).

vi. *Willingness to Provide Financing*.  The DIP Lender has indicated a willingness to provide financing to the Debtors subject to the entry of this Interim Order, and conditioned upon the entry of the Final Order, including findings that such financing is essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors as set forth in the DIP Facility Documents in good faith, and that the DIP Lender's claims, security interests, liens, rights, and other protections will have the protections provided in section 364(e) of the Bankruptcy Code.  As a condition to the entry into the DIP Facility Documents and the extension of credit under the DIP Facility, the Debtors and the DIP Lender have agreed that proceeds of the Collateral and all payments and collections received by the Debtors shall be applied solely as set forth in the DIP Facility Documents.

vii. *Business Judgment and Good Faith Pursuant to Section 364(e)*.  Based on the representations in the First Day Declaration, the record of the Interim Hearing, the extension of credit under the DIP Facility and the DIP Facility Documents, including the DIP Term Sheet, is fair, reasonable, and the best available to the Debtors under the circumstances, reflects the Debtors' sound exercise of their business judgment, is supported by reasonably equivalent value and consideration, and was entered into at arms' length, under no duress, and without undue influence.  Based on the representations in the First Day Declaration, the record of the Interim Hearing, the DIP Facility and the DIP Facility Documents, including the DIP Term Sheet, were negotiated in good faith and at arms'-length between the Debtors and the DIP Lender, with respect to all actions taken by them in connection with or related in any way to negotiation, implementing, documenting, or obtaining the requisite approvals of the DIP Facility, including with respect to the granting of the DIP Liens, any challenges or objections to the DIP Facility and all documents related

to any and all transactions contemplated by the foregoing. Any credit to be extended as set forth in the DIP Facility Documents shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Lender is therefore entitled to the protections and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

      viii.   *Marshaling*.  Subject to the entry of the Final Order, in light of the Approved Budget covering all administrative costs projected by the Debtors, the DIP Lender is entitled to a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

      ix.   *Final Hearing*.  At the Final Hearing, the Debtors will seek final approval of the proposed DIP Financing pursuant to the Final Order, which shall be in the form and substance acceptable to the DIP Lender.  Notice of the Final Hearing and Final Order shall be approved in accordance with this Interim Order and no other or further notice, except as provided by this Interim Order, shall be required.

      x.   *Immediate Entry*.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b).  The authorization granted herein on an interim basis to enter into the DIP Facility Documents, and to borrow under the DIP Facility is necessary to avoid immediate and irreparable harm to the Debtors and their estates during the period (the "**Interim Period**") beginning on the date herein through and including the earliest to occur of (i) the date of the entry of the Final Order by this Court and (ii) the Termination Date (as defined below).  This Court concludes that the entry of this Interim Order is in the best interests of the Debtors, their

estates, and their creditors because it will, among other things, allow the Debtors to maximize the value of their assets.

xi. *Notice*. Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the parties included on the Debtors' consolidated list of twenty (20) largest unsecured creditors; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) Sberbank and its counsel; (vii) counsel to the proposed DIP Lender; (viii) all known holders of liens in the Debtors' assets; and (ix) the Debtors' landlords. The notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(c) and the applicable Local Rules, and no other or further notice of the relief granted herein is necessary or required.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    Motion Granted. The Motion is GRANTED on an interim basis in accordance with the terms of this Interim Order.

2.    Objections Overruled. All objections to and reservations of rights with respect to the Motion and to the entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled on the merits in their entirety or, to the extent applicable, deferred to the Final Hearing.

**DIP Facility Authorization**

3.      _Authorization of the DIP Facility Documents_.  The Debtors are hereby authorized to execute, issue, deliver, enter into, and adopt, as the case may be, the DIP Term Sheet and the other DIP Facility Documents (including entering into the guaranties) to be delivered pursuant hereto or thereto or in connection herewith or therewith.  The Borrower is hereby authorized to borrow money under the DIP Term Sheet, on an interim basis, and request extensions of credit under the DIP Facility in accordance with the terms of this Interim Order and the DIP Term Sheet, _provided that_ during the Interim Period, an aggregate principal of up to $1,000,000 may be borrowed.

4.      _Authorized Action_.  In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized to perform all acts, to make, execute, and deliver all instruments and documents that may be necessary or required for performance by the Debtors under the DIP Term Sheet and the other DIP Facility Documents and the creation and perfection of the DIP Liens described in, provided for, and perfected by this Interim Order, the DIP Term Sheet and the DIP Facility Documents.  Subject to paragraph 11, the Debtors are hereby authorized to pay, in accordance with this Interim Order, the principal, interest, expenses, and other amounts described in the DIP Facility Documents as such become due and without need to obtain further Court approval, including, without limitation, the fees and disbursements of the DIP Lender's attorneys, advisors, accountants, and other consultants.  All fees, if any, shall be fully earned upon entry of this Interim Order and payable in accordance with the DIP Facility Documents.

5.      _Validity of DIP Obligations_.  Upon entry of this Interim Order, the DIP Term Sheet shall represent valid and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with its terms, and subject to the terms of this Interim Order.  The DIP

Term Sheet and this Interim Order constitute and evidence the validity and binding effect of the obligations thereunder of the Debtors, which obligations shall be enforceable, jointly and severally, against the Debtors, their estates, and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Cases (a "**Successor Case**").  No obligation, payment, transfer, or grant of a security or other interest to the DIP Lender under the DIP Facility Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment, or counterclaim.  The obligations of the DIP Facility include all loans and other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by the Debtor to the DIP Lender under the DIP Facility Documents, including, without limitation, all principal, interest, costs, fees, expenses, and other amounts owed pursuant to the DIP Facility Documents.

6.      No Obligation to Extend Credit.  The DIP Lender shall have no obligation to make loans or advances under the DIP Facility until the conditions precedent to the closing and the making of such extensions of credit under the DIP Term Sheet or the other DIP Facility Documents have been satisfied in full or waived.

7.      Use of DIP Facility Proceeds.  From and after the Petition Date, the Debtors are authorized to use the extensions of credit under the DIP Facility only for the purposes set forth in this Interim Order, the DIP Facility Documents, and in compliance with the Approved Budget. The Debtors authorized, subject to the satisfaction of the conditions set forth in the DIP Facility Documents, to use proceeds of the Collateral, subject to the Carve-Out, and to draw upon to DIP

Facility to fund the (i) administration of the Chapter 11 Cases[4], (ii) orderly winding down of operations and liquidation of the assets of the Liquidating Debtors, (iii) Reorganizing Debtor's business in the ordinary course during the Chapter 11 Cases, and (iv) payment of Administrative Expense Claims (including professional fee claims and 503(b)(9) claims), Priority Tax Claims, and Other Priority Claims (as such terms are defined in the Approved Plan).

**DIP Liens and Collateral**

8.    *DIP Lien Priority.*   Effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, and without the necessity of the execution by the Debtors (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules, or other similar documents, or the possession or control by the DIP Lender of any Collateral, subject only to the Carve-Out, the DIP Lender is hereby granted, *nunc pro tunc* to the Petition Date, a continuing valid, binding, enforceable, non-avoidable, and automatically and properly perfected, priming first priority, postpetition security interests in and liens on (collectively, the "**DIP Liens**") any and all of the Property (as defined in the Motion) (the "**Collateral**"), including, without limitation, subject to the entry of a Final Order, avoidance actions brought pursuant to claims and causes of actions under Sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553, 732(2) or 742(2) of the Bankruptcy Code.

9.    *Superpriority Claims.*   Upon entry of this Interim Order, the DIP Lender shall be granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Case (collectively, the "**DIP Superpriority Claims**") for all DIP Liens: (a) subject only to the Carve-

---

[4]    This shall include the payment of any and all fees due under 28 U.S.C. § 1930(a)(6).

Out, having priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Case, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law, subject only to the Carve-Out.

10.     *Treatment of DIP Liens*.  For the avoidance of doubt, and other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereafter granted in the Chapter 11 Cases or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or any Successor Case.  The DIP Liens shall not be subject to challenge under sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoid and preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

11.     <u>Costs, Fees and Expenses</u>.

(a)     The Debtors are authorized to pay any and all reasonable out-of-pocket expenses of the DIP Lender in connection with the DIP Facility, whether incurred before or after the Petition Date and whether or not the transactions contemplated hereby are consummated or such fees and expenses are set forth in the Approved Budget, including, without limitation, fees

and expenses, subject to the Carve-Out, incurred in connection with (i) the preparation, negotiation, and execution of the DIP Facility Documents; (ii) the funding of the DIP Facility; (iii) the creation, perfection, or protection of the liens under the DIP Facility Documents (including all search, filing, and recording fees); (iv) the ongoing administration of the DIP Facility Documents (including the preparation, negotiation, and execution of any amendments, consents, waivers, assignments, restatements, or supplements thereto) and the Chapter 11 Cases; (v) the enforcement of the DIP Facility Documents; (vi) any refinancing or restructuring of the DIP Facility in the nature of a "work-out" or in connection with any exit financing provided by the DIP Lender or any of its affiliates; and (vii) any legal proceeding relating to or arising out of the DIP Facility or any other transactions contemplated by the DIP Facility Documents, including the Chapter 11 Cases. Payment of all such professional fees and expenses shall not be subject to allowance by the Court. Notwithstanding the foregoing, at the same time such invoices are delivered to the Debtors, the professionals for the DIP Lender shall deliver a copy of its invoices to counsel for any statutory Committee and the U.S. Trustee.  The invoices for such fees and expenses shall not be required to comply with any with any particular format, may be in summary form only, and shall not be subject to application or allowance by the Court but shall include a reasonably-detailed statement of services rendered, time expended and expenses incurred in support of the amounts requested.  Any objections raised by the Debtors, the U.S. Trustee or any statutory Committee with respect to such invoices within ten (10) Business Days of receipt thereof will be resolved by the Court (absent prior consensual resolution thereof).  Pending such resolution, the undisputed portion of any such invoice shall be paid promptly by the Debtors.  Such fees and expenses shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

**Provisions Common to DIP Financing Authorizations**

     12.    <u>Carve-Out</u>.

     (a)    *Carve-Out*.  As used in this Interim Order and the DIP Facility Documents, the term "**Carve-Out**" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors or the Committee pursuant to Sections 327, 328, 363 or 1103 of the Bankruptcy Code (the "**Retained Professionals**") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Retained Professionals in an aggregate amount not to exceed $50,000 incurred after the first business day following delivery by DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice (including email or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

- 13 -

(b)      *No Direct Obligation to Pay Allowed Professional Fees; No Waiver of Right to Object to Fees*.  Other than the funding of the Carve-Out with the proceeds of the DIP Facility as provided herein and in the DIP Facility Documents, the DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any professional incurred in connection with the Chapter 11 Cases, any Successor Case, or otherwise.  Nothing in this Interim Order or otherwise shall be construed: (i) to obligate the DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement, other than the Carve-Out; (ii) to increase the Carve-Out if incurred or Allowed Professional Fees are higher in fact that the fees and disbursements to the professional set forth in the Approved Budget after the delivery by the DIP Lender of the Carve Out Trigger Notice; (iii) as consent to the allowance of any fees and expenses of any professional; or (iv) to affect the rights of the DIP Lender or any other party in interest to object to the allowance and payment of such fees and expenses.

(c)      *Payment of Compensation*.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any professional or shall affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses.  So long as no Termination Event has occurred and is continuing, the Debtors shall be permitted to pay fees and expenses allowed and payable by order (that has not been vacated or stayed, unless the stay has been vacated) under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, solely to the extent set forth in the Approved Budget and not to exceed the amounts set forth in the Approved Budget, *provided that* any such payments shall be subject to entry of a final order of the Court on final application for the allowance of fees and expenses to be filed for each professional.

13.     <u>Drafting, Execution and Modification of DIP Facility Documents</u>.  The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Term Sheet, any non-material modifications of the DIP Term Sheet without further order of the Court; *provided, however*, that copies of such modifications will be provided to the U.S. Trustee and any statutory Committee.  Upon entry of this Interim Order, all material modifications or amendments to the DIP Term Sheet shall only be permitted pursuant to an order of this Court on notice pursuant to Local Rule 2002-1(b) and a hearing.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions of the DIP Term Sheet shall be effective unless set forth in writing, signed on behalf of the Debtors and the DIP Lender.

14.     <u>Use of Proceeds; Budget Maintenance</u>.  The proceeds of the DIP Facility shall be used solely in accordance with the terms of the DIP Term Sheet, including the Approved Budget (subject to the Permitted Variance and the Carve-Out), and this Interim Order.  The Approved Budget shall be updated, modified, or supplemented (with the consent of and/or at the request of the DIP Lender) from time to time, solely in accordance with the DIP Term Sheet.

15.     <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to permit the Debtors to grant the DIP Liens.

16.     <u>Automatic Perfection of DIP Liens</u>.

(a)     This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens, without the necessity of filing or recording financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, taking possession of or control over, or

- 15 -

the taking of any other action (including, for the avoidance of doubt, entering into any deposit control agreement) to validate to perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Lender to the priorities granted herein.

(b)       Notwithstanding the foregoing, the DIP Lender is hereby authorized to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction, take possession of or control over, or take any other action, as they may elect, in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Lender chooses to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction, take possession of or control over, or otherwise perfect the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination immediately upon entry of this Interim Order.

(c)       The Debtors are authorized to execute and deliver promptly upon demand to the DIP Lender, all such financing statements, mortgages, control agreements, notices, and other documents as the DIP Lender may reasonably request to evidence, confirm, validate, or perfect the DIP Liens.

(d)       The DIP Lender, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, and accordingly, each officer is authorized, to the extent permitted under applicable law, to accept and record the photocopy of this Interim Order, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

17.       Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer, or any other estate representative subsequently appointed

in the Chapter 11 Cases or any Successor Case shall obtain credit or incur debt in breach of the

DIP Facility Documents at any time prior to the repayment in full of all obligations under the DIP

Facility, including subsequent to the confirmation of any plan of reorganization or liquidation with

respect to the Debtors and their estates, then all cash proceeds derived from such credit or debt

shall be turned over immediately to the DIP Lender to be applied in accordance with this Interim

Order and the DIP Term Sheet.

18.    <u>Maintenance of Collateral/Cash Management</u>.  Until the payment in full in cash of

all obligations of the DIP Facility, and the termination of the obligation of the DIP Lender to extend

credit under the DIP Facility, the Debtors are authorized to (a) maintain and insure the Collateral

in amounts, for the risks, and by the entities as required under the DIP Facility Documents and (b)

maintain their cash management system as in effect as of the Petition Date, (i) subject to any order

of this Court with respect to the Debtors' cash management system, as may be modified, with the

prior written consent of the DIP Lender, by any order than may be entered by this Court; and (ii)

in a manner which, in any event, shall be reasonably satisfactory to the DIP Lender.  Other than as

required expressly pursuant to the DIP Facility Documents, any order of this Court with respect to

the Debtors' cash management system, or this Interim Order, no modifications to the Debtors'

cash management system existing as of the Petition Date may be made without the prior written

approval of the DIP Lender.

19.    <u>Termination Event</u>.  The occurrence of an Event of Default under the DIP Facility

Documents is referred to herein as a "**Termination Event**."

20.    <u>Rights and Remedies Following Termination Event</u>.

(a)    *Termination*.  Immediately upon the occurrence and during the continuation

of a Termination Event, the DIP Lender, without further action of this Court, may notify the

- 17 -

Debtors in writing that a Termination Event has occurred and is continuing (such notice, a "**Termination Notice**" and the date of any such notice, the "**Termination Notice Date**").

(b)    *Notice of Termination*.    Any Termination Notice shall be provided by electronic mail (or other electronic means) to counsel to the Debtors, counsel to any statutory Committee (if one has been formed, or if one has not been formed, the Debtors' consolidated twenty (20) largest creditors) and the U.S. Trustee.  The Remedies Notice Period shall commence on the Termination Notice Date and shall expire five (5) business days after the Termination Notice Date (the "**Remedies Notice Period**" and the date of the expiration of the Remedies Notice Period, the "**Termination Date**").

(c)    Without limiting the rights and remedies of the DIP Lender under the DIP Term Sheet, the DIP Lender may immediately (i) upon the occurrence of and during the continuing of a Termination Event following the issuance of a Termination Notice or (ii) the Termination Date, *inter alia*, (a) declare (x) subject to the Remedies Notice Period, all obligations owing under the DIP Facility Documents to be due and payable immediately, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, (y) the termination, reduction, or restriction of any further commitment to extend credit to the Borrower to the extent any such commitment remains, and (z) terminate the DIP Facility and the DIP Facility Documents as to any future liability or obligation of any DIP Lender, but without affecting any of the liens or the obligations (any of the actions set forth in the foregoing (x), (y), and (z), a "**Termination**"); and (b) unless the Court orders otherwise during the Remedies Notice Period, exercise all other rights and remedies provided in the DIP Facility Documents and applicable law.

(d)    During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with this Court for the purpose of contesting a Termination, including

whether a Termination Event has occurred and/or is continuing.  During the Remedies Notice Period, the Debtors may continue to use the Collateral in the ordinary course of business and consistent with the most recent Approved Budget (subject to the Permitted Variance), but may not enter into any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales or transactions with non-Debtor affiliates) that are not in the ordinary course of business or otherwise in furtherance of the administration of the Chapter 11 Cases.

21.    Good Faith.

(a)    *Good Faith Under Section 364 of the Bankruptcy Code; No Modification or Stay of this Interim Order.*  The DIP Lender has acted in good faith in connection with this Interim Order and its reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order, the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of the Court, or any other court of competent jurisdiction, the DIP Lender is entitled to the protections provided by section 364(e) of the Bankruptcy Code.

22.    Proofs of Claim.  Subject to entry of the Final Order, any order entered by the Court establishing a bar date for any claims (including, without limitation, administrative claims) in the Chapter 11 Cases or any Successor Case shall not apply to the DIP Lender (solely in its capacity as such).  Subject to entry of the Final Order, the DIP Lender (solely in its capacity as such) shall not be required to file proofs of claim or requests for approval of administrative expenses authorized by this Interim Order in the Chapter 11 Case or any Successor Case, and the provisions of this Interim Order, and, upon the entry thereof, the Final Order, relating to the amount of the

obligations under the DIP Facility and the DIP Liens shall constitute a timely proof of claim and/or administrative expense request.

23. <u>Rights of Access and Information</u>.  The Debtors shall provide the DIP Lender and/or its representatives, agents, and/or employees, reasonable access to the Debtors' premises, knowledgeable officers, and their books and records, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.

24. <u>Prohibited Use of DIP Facility, Collateral, Carve-Out, etc.</u>  Except as may be ordered otherwise, without the prior written consent of the DIP Lender, the DIP Facility, and the Collateral may not be used:

> (a) for the payment of interest and principal with respect to any prepetition indebtedness of the Borrower, except for: (i) the Carve-Out; (ii) prepetition employee wages, benefits, and related employee taxes as of the Petition Date; (iii) prepetition sales, use, and real property taxes; (iv) prepetition amounts due with respect to any insurance financings, premiums, and brokerage fees; (v) payment of fees and expenses (including fees and expenses of professionals) of the DIP Lender, and subject to the limitations set forth in the Approved Budget; (vi) other "first day" interim and final orders permitting payment of prepetition claims; (vii) cure amounts reasonably acceptable to the DIP Lender under any leases or executory contracts assumed with approval of the Court; and (viii) other prepetition indebtedness to the extent authorized by the Court and set forth in the Approved Budget;

> (b) subject to this Interim Order (or Final Order, when applicable) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion, or other litigation of any type adverse to the rights, remedies, claims, or defenses of the DIP Lender under the DIP Term Sheet, this Interim Order (or, where applicable, the Final Order), including preventing, hindering, or otherwise delaying the exercise of any rights, remedies, claims, or defenses by the DIP Lender under the DIP Term Sheet, this Interim Order (or, when applicable, the Final Order) the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief (a) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the obligations of the DIP Facility or DIP Liens; (b) for monetary, injunctive or other affirmative relief against the DIP Lender or the Collateral; or (c) preventing, hindering, or otherwise delaying the exercise by the DIP Lender of any

rights and remedies under this Interim Order or the Final Order, the DIP Facility Documents, or applicable law, or the enforcement or realization (whether by foreclosure, further order of the Court, or otherwise) by the DIP Lender upon any of its Collateral.

(c)     to make any distribution under a plan of reorganization in the Chapter 11 Cases.

(d)     to make any payment in settlement of any claim, action, or proceeding, before any court, arbitrator, or other governmental body, without prior written consent of the DIP Lender, unless otherwise set forth in the Approved Budget, or unless otherwise ordered by the Court;

(e)     to object to, contest, or interfere with, in any way, the DIP Lender's enforcement or realization upon any of the Collateral once a Termination Event has occurred, except as provided for in this Interim Order or the Final Order;

(f)     to use or seek to use any insurance or tax refund proceeds constituting Collateral other than solely in accordance with the Approved Budget and the DIP Facility Documents;

(g)     to incur indebtedness other than in accordance with the Approved Budget or the DIP Facility Documents without the prior consent of the DIP Lender;

(h)     to object to or challenge in any way the claims, liens, or interests held by or on behalf of the DIP Lender;

(i)     to assert, commence, prosecute, or support any claims or causes of action whatsoever, including, without limitation, any Avoidance Action, against the DIP Lender;

(j)     to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of, or seeking equitable relief from, any of the obligations under the DIP Facility, the DIP Liens, or any other rights or interests of the DIP Lender;

(k)     to sell or otherwise dispose of the Collateral other than as contemplated by the DIP Term Sheet; or

(l)     for any purpose otherwise limited by the DIP Term Sheet.

25.    <u>No Third-Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

26.    <u>Section 552(b)</u>.  Subject to the entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, products, offspring, or profits of any of the Collateral.

27.    <u>No Marshaling/Application of Proceeds</u>.  Upon entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

28.    <u>505(c) Waiver</u>.  Upon entry of the Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection, or enhancement of, or realization by the DIP Lender upon the Collateral.

29.    <u>Discharge Waiver</u>.  The Debtors expressly stipulate, and the Court finds and adjudicates, that none of the obligations under the DIP Facility or the DIP Liens shall be discharged by the entry of an order confirming any plan of reorganization or liquidation, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the obligations under the DIP Facility have been paid in full in cash on or before the effective date of a confirmed plan of reorganization or liquidation.  Except as otherwise agreed to by the DIP Lender, the Debtors shall not propose or support any plan or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full, in cash, of all obligations under the DIP Facility without the express written consent of the DIP Lender.

- 22 -

30.     <u>Rights Preserved</u>.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable, or otherwise) of the DIP Lender are preserved.

31.     <u>Release</u>.  Subject to the entry of the Final Order, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in the Chapter 11 Cases or any Successor Case) and any party acting by or through the Debtors or their estates, hereby stipulate and agree that they forever and irrevocably (a) release, discharge, waive, and acquit the DIP Lender, and each of their respective participants and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, successors, assigns, and predecessors in interest (collectively, and in each case in their capacities as such, the "**Released Parties**"), from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, continent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation, or by contract, of every nature and description, arising out of, in connection with, or relating to the negotiation, documentation, or execution of the DIP Facility, the DIP Term Sheet, the DIP Facility Documents, or the transactions contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of

action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Lender, and (b) waive any and all defenses (including, without limitation, offset and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the obligations under the DIP Facility and the DIP Liens.

32.    <u>No Waiver by Failure to Seek Relief</u>.    Immediately upon entry by the Court (notwithstanding any applicable law or rule to the contrary) and the occurrence of the DIP Closing Date, the terms and the provisions of this Interim Order, including the liens granted herein shall, *nunc pro tunc* to the Petition Date, become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, all other creditors of the Debtors, any statutory Committee or any other duly appointed committee in the Chapter 11 Cases, the U.S. Trustee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Case, or upon dismissal of the Chapter 11 Cases or any Successor Case.

33.    <u>Interim Order Control</u>.  This Interim Order shall constitute this Court's findings of fact and conclusions of law based upon the record of the Chapter 11 Cases at the Interim Hearing and shall, upon its entry by this Court, take effect and be fully enforceable *nunc pro tunc* to the Petition Date.   There shall be no stay of execution or effectiveness of this Interim Order, notwithstanding anything to the contrary in the Bankruptcy Rules or other applicable law; any applicable stay is hereby waived.   In the event of any inconsistency between the terms and conditions of the DIP Term Sheet, the DIP Facility Documents, or this Interim Order, the provisions of this Interim Order shall govern and control.

34.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of

reorganization in the Chapter 11 Cases; (b) converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Cases or any Successor Case; or (d) pursuant to which the Court abstains from hearing the Chapter 11 Cases or any Successor Case. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted by the DIP Lender pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by this Interim Order until all obligations under the DIP Facility have been paid in full.

35.    Cooperation Among the Parties.  Except in the event not reasonably practicable, the Debtors shall provide copies of all substantive motions, applications, other pleadings, and proposed forms of order with respect thereto (all of which shall be in form and substance reasonably acceptable to the DIP Lender) to the DIP Lender prior to the filing of any such substantive motions, applications, other pleadings, and proposed forms of order with respect thereto with the Court.

36.    Preservation of Rights Granted Under this Interim Order.

(a)    Except as provided expressly herein or in the DIP Term Sheet, no claim or lien having a priority senior to or *pari passu* with that granted by this Interim Order to the DIP Lender shall be granted while any portion of the obligations under the DIP Facility remains outstanding, and the DIP Liens shall not be subject to or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinate to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

- 25 -

(b)    Unless all obligations under the DIP Facility shall have been indefeasibly paid in full, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Term Sheet, if the Debtors seek, or if there is entered (i) any stay, vacatur, rescission, or modification of this Interim Order or the Final Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction, or acquiescence by the DIP Lender, (ii) an order converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of these Chapter 11 Cases, or (iii) unless otherwise approved by the DIP Lender, an order granting a change of venue with respect to the Chapter 11 Cases or any related adversary proceeding.  If an order dismissing the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, (x) the DIP Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all obligations under the DIP Facility shall have been paid and satisfied in full, and shall, notwithstanding such dismissal, remain binding on all parties in interest, and (y) this Court shall retain jurisdiction, to the extent it has jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(c)    The DIP Lender shall be entitled to all of the rights, remedies, privileges, and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order, and pursuant to the DIP Term Sheet and the DIP Facility Documents with respect to all such uses of the Collateral and all obligations under the DIP Facility.

(d)    Nothing contained in this Interim Order shall limit the Debtors' fiduciary duties.

37.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and approval of the DIP Facility on a final basis is scheduled for [_____] at [___[ ].m. (*prevailing*

Eastern Time) before The Honorable Mary F. Walrath, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Fifth Floor, Court Room 4, Wilmington, Delaware 19801.

38.    <u>Notice of Final Hearing</u>.  Within three (3) Business Days of the date of the entry of this Interim Order, the Debtors shall serve, by the United States mail, first-class postage prepaid, a copy of the Motion and this Interim Order upon: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the parties included on the Debtors' consolidated list of twenty (20) largest unsecured creditors; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) Sberbank and its counsel; (vii) counsel to the proposed DIP Lender; and (viii) all known holders of liens in the Debtors' assets; (ix) the Debtors' landlords.

39.    <u>Objection Deadline</u>.  Objections, if any, to the relief sought in the Motion, on a final basis, shall be in writing, shall be set forth with particularity the grounds for such objections or other statements of position, shall be filed with the clerk of the Court, and personally served upon: (a) proposed counsel to the Debtors; (b) the U.S. Trustee; (c) proposed counsel to any statutory Committee; and (d) counsel to the DIP Lender, so that such objections are filed with the Court and received by said parties on or before 4:00 p.m., *prevailing* Eastern Time on [_____] with respect to entry of the Final Order.

40.    <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction relating to and arising out of the interpretation, implementation, or enforcement of this Interim Order.

# EXHIBIT 1

<u>**JUNO USA LP,** *et al.*</u>

**SUMMARY OF TERMS AND CONDITIONS FOR A $4,500,000**
**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FINANCING**

| | |
|---|---|
| *The following describes the terms of a debtor-in-possession financing ("**DIP Facility**") to be provided to GT Forge, Inc. ("**GT Forge**" or the "**Reorganizing Debtor**"), Juno Oregon LLC ("**Juno Oregon**"), Juno USA, LP ("**Juno USA**"), Omaha LLC ("**Omaha**"), Vulcan Cars LLC ("**Vulcan**") and Sabo One LLC ("**Sabo One**", and collectively with Juno Oregon, Juno USA, Omaha, Vulcan and Sabo One, the "**Liquidating Debtors**", and together with the Reorganizing Debtor, the "**Debtors**") during the pendency of the cases filed under Chapter 11 ("**Chapter 11 Cases**") of the United States Bankruptcy Code (the "**Bankruptcy Code**").* | |

| |
|---|
| *This term sheet (the "**Term Sheet**") is non-binding and is intended for discussion purposes only and does not constitute a commitment to lend. The DIP Lender's (as defined below) commitment and other obligations hereunder are subject to satisfaction or waiver (by the DIP Lender in its sole discretion) of the following: (i) the preparation, execution and delivery of mutually acceptable loan documentation, which shall take the form of this Term Sheet and that certain Superpriority Debtor-in-Possession Secured Promissory Note, incorporating substantially the terms and conditions outlined in this Term Sheet ("**DIP Facility Documents**"); (ii) the accuracy and completeness of all representations that the Loan Parties (as defined below) make to the DIP Lender and all information that such furnish to the DIP Lender; (iii) the Loan Parties' compliance with the terms of this Term Sheet, including, without limitation, the payment in full of all fees, expenses and other amounts payable hereunder; and (iv) the other conditions set forth in this Term Sheet or referred to in Appendix I. Except as expressly provided in any binding written agreement the parties may enter into in the future, upon approval of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), no past, present or future action, course of conduct, or failure to act relating to the transactions or proposals referred to in this Term Sheet or relating to the negotiation of the terms of such transactions or proposals shall give rise to or serve as the basis for any obligation or other liability on the part of the DIP Lender. The terms and conditions set forth herein are mutually dependent on each other, and the DIP Lender shall not be obligated to extend credit unless agreement with the Loan Parties and approval by the Bankruptcy Court is obtained with respect to such terms and conditions as a whole.* |

| | |
|---|---|
| **Borrower** | Juno USA, LP, as a debtor and debtor in possession in the Chapter 11 Cases (the "**Borrower**"). |
| **Guarantors** | Debtors other than the Borrower.<br><br>The Borrower and Guarantors are collectively referred to herein as the "**Loan Parties**". |
| **DIP Lender** | GT Gettaxi Limited or an affiliate entity thereof (the "**DIP Lender**"). |
| **Amount** | The DIP Facility shall comprise a term loan in an aggregate principal amount of up to $4,500,000 (the "**Commitment**").<br><br>An initial amount of $1,000,000 will be made available upon entry of an interim order of the Bankruptcy Court, in form and substance satisfactory to the DIP Lender in its sole discretion, approving the financing (the "**Interim Order**") and |

1

|  | the date the Bankruptcy Court enters the Interim Order. The remainder of the facility will be made available subject to entry of an order of the Bankruptcy Court, in form and substance satisfactory to the DIP Lender in its sole discretion, approving the DIP Facility on a final basis (the "***Final Order***", and together with the Interim Order, the "***DIP Orders***").<br><br>The DIP Facility is provided for the purposes listed under "Use of Proceeds" below in accordance with the Approved Budget (as defined below). |
|---|---|
| **Approved Budget** | The 13-week statement of receipts and disbursements for the next 13 weeks of the Loan Parties, broken down by week, including the anticipated uses of the DIP Facility for such period ("***Approved Budget***"), and thereafter at the end of each week an updated 13-week projection for the subsequent 13-week period (which in each case must be satisfactory to the DIP Lender in its sole discretion).<br><br>The DIP Loans shall be funded into a cash collateral account at a depository approved by the DIP Lender, and the amounts in the account that may be drawn out during each week will be limited to the maximum amount of DIP Loans projected to be utilized during such week in accordance with the Approved Budget.<br><br>The Debtors shall provide a budget variance report/reconciliation (the "***Budget Variance Report***") by 12:00 p.m. prevailing Eastern Time on Wednesday of each week for the week most recently ended: (i) showing by line item actual cash receipts, disbursements, professional fees, capital expenditures, and billings for the immediately preceding week, the immediately preceding rolling four-week, cumulative period on and after the entry of the Interim Order, noting therein all variance, on a line-item basis, from amounts set forth for such period in the Approved Budget, and shall include explanations for all material variance for such week; and (ii) certified by a responsible officer of the Debtors. |
| **Priority and Liens** | All obligations under the DIP Facility, subject to the Carve-Out (as defined below), shall at all times:<br><br>(i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status having priority over any and all other claims;<br><br>(ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first-priority lien on all unencumbered now-owned or after-acquired Property (as defined below) of the Loan Parties that are not otherwise subject to any lien; and<br><br>(iii)    pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all now-owned or after-acquired Property of the Loan Parties that are subject to (x) any valid, perfected and non-avoidable lien in existence on the Filing Date, or (y) any valid lien in existence on the Filing Date that is perfected subsequent to the Filing Date by Section 564(b) of the Bankruptcy Code.<br><br>(iv)    pursuant to Section 364(d) of the Bankruptcy Code, be secured by a perfected priming lien on all now-owned or after-acquired Property of the Loan Parties, including Sberbank's first-priority lien against all of GT Forge's assets, |

2

|   | |
|---|---|
| | subject to (x) any valid, perfected and non-avoidable lien in existence on the Filing Date, or (y) any valid lien in existence on the Filing Date that is perfected subsequent to the Filing Date by Section 564(b) of the Bankruptcy Code.<br><br>The assets described above, collectively, the "***Collateral***".<br><br>"***Property***" shall mean, with respect to any of the Loan Parties, all real and personal property of such Loan Party including, without limitation, (i) all cash, money, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, goods and inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles of any kind, rights to the payment of money, supporting obligations, guarantees, general intangibles, letter of credit rights, other than the letters of credit collateralized by an account at Citibank, commercial tort claims, causes of action and all substitutions, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (ii) all owned real property, all leased real property, all rents and leases from any real property interests, and all other proceeds of real property; (iii) subject to the entry of a Final Order, avoidance actions brought pursuant to claims and causes of actions under Sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553, 732(2) or 742(2) of the Bankruptcy Code; (iv) subject to the entry of a Final Order, rights under Section 506(c) of the Bankruptcy Code and (v) all proceeds of the foregoing.  For the avoidance of doubt, the DIP Collateral shall include all the foregoing rights, property, claims, and interests, without regard as to whether such rights, property, claims, and interests came into the Loan Parties' estates, or otherwise arose, after the Filing Date.<br><br>All of the DIP Liens described herein with respect to the assets of the Loan Parties shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. |
| **Carve-Out** | The Carve Out is  the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors or the Committee pursuant to Sections 327, 328, 363 or 1103 of the Bankruptcy Code (the "***Retained Professionals***") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Retained Professionals in an aggregate amount not to exceed $50,000 incurred after the first business day following delivery by DIP Lender of the Carve Out Trigger Notice, to the extent allowed |

| | |
|---|---|
| | at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "***Post-Carve Out Trigger Notice Cap***"). For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice (including email or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **DIP Closing Date** | The date on or after the entry of the Interim Order on which the "***Conditions to DIP Closing***" described in <u>Appendix I</u> hereto (excluding "***Conditions to Final Loan***") hereto have been satisfied or waived by the DIP Lender (the date of such closing, the "***DIP Closing Date***"). |
| **Maturity** | The DIP Loans shall be repaid in full, and the Commitment shall terminate, on the earliest to occur (the "***Maturity Date***") of (i) the date that is 45 days after entry of the Interim Order by the Bankruptcy Court, if Final DIP Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Loan Parties to a Chapter 7 liquidation or the dismissal of the bankruptcy case of any Loan Party, (ii) the acceleration of the DIP Loans and the termination of the Commitment under the DIP Facility, (iii) the sale of all or substantially all of the Loan Parties' assets, (iv) the effective date of the joint plans of reorganization and liquidation for the Loan Parties; and (v) 180 days after the Filing Date (the "***Outside Date***"). |
| **Use of Proceeds** | Subject to the terms and conditions herein, the proceeds of DIP Facility will be used in accordance with the terms of the Approved Budget, including, without limitation, to fund the (i) administration of the Chapter 11 Cases, (ii) orderly winding down of operations and liquidation of the assets of the Liquidating Debtors, (iii) Reorganizing Debtor's business in the ordinary course during the Chapter 11 Cases, and (iv) payment of Administrative Expense Claims (including professional fee claims and 503(b)(9) claims), Priority Tax Claims and Other Priority Claims (each such term as defined in the Approved Plan). |
| | No portion of the Borrowers' cash collateral and other cash (collectively, the "***Cash Collateral***"), the DIP Loans, the Collateral or the Carve-Out may be used to investigate, commence or prosecute any action, proceeding or objection with respect to or related to (1) the claims, liens or security interests of the DIP Lender, (2) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of the Release (as defined below), or (3) certain stipulations to be made by the Loan Parties and approved by the Interim DIP Order. |
| **Interest Rate** | All amounts outstanding under the DIP Facility will PIK interest at a fixed rate equivalent to the LIBOR Rate <u>plus</u> 8% per annum, which fixed rate shall be determined as of the DIP Closing Date. |
| | As used herein, the term "***LIBOR Rate***" will have meaning customary and appropriate for financings of this type, and the basis for calculating accrued interest and the interest periods for loans bearing interest at the LIBOR Rate will |

| | |
|---|---|
| | be customary and appropriate for financings of this type; *provided that* in no event will the LIBOR Rate be less than 1.50%.<br><br>During the continuance of an Event of Default, the DIP Loans and all other outstanding obligations will bear interest at an additional 1% per annum above the interest rate otherwise applicable. |
| **Voluntary Prepayments** | The DIP Loans may be permanently prepaid in full by the Loan Parties at any time. |
| **Representations** | Those representations and warranties as are customary or appropriate in the context of the proposed DIP Facility (including, without limitation, organization and good standing, due authorization, all governmental approvals, taxes, all permits, insurance, compliance with regulation, etc.) or as otherwise required by the DIP Lender. |
| **Affirmative Covenants** | The DIP Facility shall contain affirmative covenants customary or appropriate in the context of the proposed DIP Facility or as otherwise required by the DIP Lender. |
| **Negative Covenants** | The DIP Facility shall contain negative covenants customary or appropriate in the context of the proposed DIP Facility or as otherwise required by the DIP Lender. |
| **Financial Covenants** | Compliance with the Approved Budget with actual results to be tested against such Approved Budget on a rolling weekly basis.<br><br>The Loan Parties shall allow the DIP Lender (and its representatives, professionals and consultants) access to the Loan Parties' premises, representatives and books and records during regular business hours in order to monitor financial performance, Approved Budget compliance and Collateral. |
| **Milestones** | The Loan Parties shall achieve the following milestones (the "***Milestones***"):<br><br>(i) commencement of the Chapter 11 Cases (the "***Filing Date***") no later than November 19, 2019;<br><br>(ii) filing with the Bankruptcy Court the non-consolidated, joint prearranged plans of reorganization and liquidation of the Loan Parties, in form and substance reasonably acceptable to the DIP Lender (the "***Plan***") and disclosure statement ("***Disclosure Statement***") within twenty (20) business days of the Filing Date;<br><br>(iii) obtaining entry of a Bankruptcy Court order, in form and substance satisfactory to the DIP Lender, approving the Disclosure Statement within eighty (80) days of the Filing Date;<br><br>(iv) obtaining entry of a Bankruptcy Court order, in form and substance satisfactory to the DIP Lender, confirming the Plan within one hundred and twenty (120) days of the Filing Date; |

EAST\169769625.10

|  | (v) the effective date of the Plan shall be within ten (10) days of entry of an order confirming the Plan, and in any event, no more than one hundred and thirty (130) days following the Filing Date; and<br><br>(vi) the repayment in full of the DIP Loans by the Outside Date. |
|---|---|
| **Waivers** | The Final DIP Order shall provide customary waivers in favor of the DIP Lender, including waivers of (i) automatic stay in connection with the DIP Lender's enforcement of remedies upon an Event of Default, (ii) any surcharge of costs or expenses with respect to the DIP Lender's interest in the Collateral under Sections 506(c) and 552 of the Bankruptcy Code and (iii) the equitable doctrine of marshaling. |
| **Events of Default** | The DIP Facility shall contain events of default customary or appropriate in the context of the proposed DIP Facility or as otherwise required by the DIP Lender (the "**Events of Default**"), including, without limitation: (i) any amendment, supplement or other modification to the Plan without the consent of the DIP Lender; (ii) the entry of an order approving any Disclosure Statement in support of the Plan other than the Plan, unless consented to by the DIP Lender; (iii) the violation of any term, provision or condition in the Interim Order or Final Order; (iv) dismissal of the Chapter 11 Cases; (v) entry of a judgment or order by the Bankruptcy Court or any other court modifying, limiting, subordinating, re-characterizing, or avoiding the validity, enforceability, perfection, or priority of any of the Loan Parties' obligations under the DIP Facility or the liens securing the DIP Facility (or any invalidation or impairment of liens or security interests of the DIP Lender shall otherwise occur), or, subject to entry of the Final Order, imposing, surcharging or assessing against the DIP Lender's interest in the Collateral, any costs or expenses, whether pursuant to sections 506(c) or 552 of the Bankruptcy Code; (vi) the making of any payment or disbursement that is not set forth as a line item on the Approved Budget; and (vii) failure to satisfy any Milestones. |
| **Remedies** | Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Lender may, (i)(a) declare all obligations to be immediately due and payable, (b) declare the termination, reduction or restriction of any further Commitment, to the extent any such Commitment remains, and (c) terminate the DIP Facility as to any future liability or obligation of the DIP Lender, but without affecting any of the obligations under the DIP Facility, the liens under the DIP Facility, or post-petition administrative superpriority claim status; and (ii) declare a termination, reduction or restriction on the ability of the Loan Parties to use any cash collateral derived solely from the proceeds of Collateral (any such declaration shall be made to the Loan Parties, the official committee of creditors of the Loan Parties (if applicable) and the United States Trustee (if applicable)). |
| **Release** | The Loan Parties will provide customary releases for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations related to or arising out of the DIP Loans (the "**Release**"). |

EAST\169769625.10

EXECUTION VERSION

| | |
|---|---|
| **Indemnity** | The Loan Parties shall, jointly and severally, be obligated to indemnify and hold harmless the DIP Lender, and its officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in this Term Sheet. |
| **Governing Law** | The DIP Loans Documents will provide that the Loan Parties will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State of Delaware; and shall waive any right to trial by jury.<br><br>Delaware law shall govern the DIP Loans Documents except to the extent preempted by federal bankruptcy laws. |

The preceding summary of proposed terms and conditions is not intended to be all-inclusive.  Any terms and conditions that are not specifically addressed above would be subject to future negotiations with the DIP Lender and comprehensive documentation of the transaction that is acceptable to the DIP Lender will have to be prepared.

[*signature pages follow*]

7

IN WITNESS WHEREOF, the undersigned have caused this Term Sheet to be executed and delivered by their duly authorized officers, as of the date and year and at a place first above written.

**JUNO USA, LP**, as Borrower

By: _____

Name:  Melissa S. Kibler

Title:  Chief Restructuring Officer

**JUNO OREGON LLC**, as a Guarantor

By: _____

Name:  Melissa S. Kibler

Title:  Chief Restructuring Officer

**GT FORGE, INC**., as a Guarantor

By: _____

Name:  Melissa S. Kibler

Title:  Chief Restructuring Officer

**VULCAN CARS LLC**, as a Guarantor

By: _____

Name:  Melissa S. Kibler

Title:  Chief Restructuring Officer

EAST\169769625.10

**EXECUTION VERSION**

**SABO ONE LLC**, as a Guarantor

By: _____

Name:  Melissa S. Kibler

Title:  Chief Restructuring Officer


**OMAHA LLC**, as a Guarantor

By: _____

Name:  Melissa S. Kibler

Title:  Chief Restructuring Officer

9

**GT GETTAXI LIMITED**, as DIP Lender

By: _____

Name:

Title:

Appendix I

Conditions to DIP Closing

**Conditions to Interim DIP Loan**

1.  Interim Order/Bankruptcy Matters.

    (a) The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the DIP Lender.

    (b) The Bankruptcy Court shall have entered an Interim Order as to the DIP Facility (and no appeal thereof shall have been filed or remain pending) which Interim Order shall be in form and substance satisfactory in the sole discretion of the DIP Lender and shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge.

    (c) All orders entered by the Bankruptcy Court, including orders pertaining to cash management , and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the DIP Lender, be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Lender.

2.  Customary Closing Documents.

    (a) All costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated by the DIP Facility Documents and this Term Sheet to be payable shall have been paid to the extent due and the Loan Parties shall have complied in all respects with all of their other obligations to the DIP Lender.

    (b) The DIP Lender shall be satisfied that the Loan Parties have complied with all other customary closing conditions (unless such conditions are waived by the DIP Lender). The Loan Parties and the transactions contemplated by this Term Sheet shall be in compliance with all applicable laws and regulations.

    (c) Execution and delivery by the Loan Parties of the DIP Facility Documents evidencing the loans made and to be made under the DIP Facility.

    (d) Such other conditions as are reasonably requested by the DIP Lender shall have been satisfied by the Loan Parties.

**Conditions to Final  Loan**

    (a) The Final Order shall have been entered by the Bankruptcy Court (and no appeal thereof shall have been filed or remain pending) not later than 45 days after entry of the Interim Order by the Bankruptcy Court, and such Final Order shall (i) have included waivers of (x) the automatic stay in connection with the DIP Lender's enforcement of remedies upon an Event of Default, (y) any surcharge of costs or expenses with respect to the DIP Lender's interest in the Collateral under Sections 506(c) and 552 of the Bankruptcy Code, and (z) the equitable doctrine of marshaling, and

11

otherwise be in form and substance satisfactory to the DIP Lender, be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated (in whole or in part) absent prior written consent of the DIP Lender and (ii) grant a perfected lien on the Collateral in favor of the DIP Lender on the terms and conditions set forth herein.   The Final Order shall be in form and substance satisfactory to the DIP Lender in its sole discretion.

**Conditions to All Loans**:

(a) the DIP Lender shall have received the Approved Budget, any required periodic updates pursuant to the Approved Budget and any variance reports, each in form and substance satisfactory to the DIP Lender, and the Loan Parties shall be in compliance with the Approved Budget.

(b) The Loan Parties shall be in compliance with the DIP Orders.

(c) The following statements shall be true and correct:  (i) the representations and warranties contained in the DIP Facility Documents are true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such date, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on such date, or would result from the making of such borrowing  on such date.

Such other conditions customary or appropriate in the context of the proposed DIP Facility as may be requested by the DIP Lender.

EAST\169769625.10

# EXHIBIT 2

**Juno USA, LP et al.**
**DIP Budget - Summary**
*(Amounts in $)*

| | 11/24/19 1 Fcst. | 12/1/19 2 Fcst. | 12/8/19 3 Fcst. | 12/15/19 4 Fcst. | 12/22/19 5 Fcst. | 12/29/19 6 Fcst. | 1/5/20 7 Fcst. | 1/12/20 8 Fcst. | 1/19/20 9 Fcst. | 1/26/20 10 Fcst. | 2/2/20 11 Fcst. | 2/9/20 12 Fcst. | 2/16/20 13 Fcst. | Total 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending:** / **Forecast Week:** / **Forecast / Actuals:** | | | | | | | | | | | | | | |
| **Receipts:** | | | | | | | | | | | | | | |
| Receivables | $ 800,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 800,000 |
| Sublet Rent | - | - | - | 10,071 | - | - | - | 10,071 | - | - | - | - | - | 20,141 |
| Asset Sale Proceeds | - | - | - | 50,000 | 25,000 | - | - | - | - | - | - | - | - | 75,000 |
| Other | 25,000 | - | - | - | - | - | - | - | 25,000 | - | - | - | - | 50,000 |
| **Total Receipts** | **825,000** | **-** | **-** | **60,071** | **25,000** | **-** | **-** | **10,071** | **25,000** | **-** | **-** | **-** | **-** | **945,141** |
| **Operating Disbursements [1]:** | | | | | | | | | | | | | | |
| Rent | - | - | (15,000) | - | - | - | (15,000) | - | - | - | - | (2,000) | - | (32,000) |
| Payroll | (135,818) | - | (33,979) | - | (8,846) | (257,359) | (8,846) | - | (8,846) | (1,500) | (58,846) | - | (8,846) | (522,887) |
| Taxes/Fees | - | (700,000) | - | - | (280,000) | (20,000) | - | - | - | - | - | - | - | (1,000,000) |
| Other Vendors | (26,000) | (26,163) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (272,163) |
| Other Professionals | - | - | (15,000) | - | (10,000) | - | - | (15,000) | - | (40,000) | - | (15,000) | - | (95,000) |
| **Total Operating Disbursements** | **(161,818)** | **(726,163)** | **(83,979)** | **(20,000)** | **(318,846)** | **(297,359)** | **(28,846)** | **(50,000)** | **(28,846)** | **(61,500)** | **(78,846)** | **(37,000)** | **(28,846)** | **(1,922,050)** |
| **Restructuring Disbursements:** | | | | | | | | | | | | | | |
| Professional Fees | - | - | - | - | (145,000) | (80,000) | - | - | - | (430,000) | (81,000) | - | - | (736,000) |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | (24,324) | - | - | - | (24,324) |
| **Total Restructuring Disbursements** | **-** | **-** | **-** | **-** | **(145,000)** | **(80,000)** | **-** | **-** | **-** | **(454,324)** | **(81,000)** | **-** | **-** | **(760,324)** |
| **Financing:** | | | | | | | | | | | | | | |
| DIP Debt Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Interest (Cash) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Financing** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Net Cash Flow** | **$ 663,182** | **$ (726,163)** | **$ (83,979)** | **$ 40,071** | **$ (438,846)** | **$ (377,359)** | **$ (28,846)** | **$ (39,929)** | **$ (3,846)** | **$ (515,824)** | **$ (159,846)** | **$ (37,000)** | **$ (28,846)** | **$ (1,737,232)** |
| **Cash Balance:** | | | | | | | | | | | | | | |
| Beginning Cash [2] | $ 746,825 | $ 1,410,007 | $ 933,844 | $ 949,865 | $ 989,936 | $ 551,089 | $ 173,730 | $ 144,884 | $ 104,955 | $ 101,109 | $ 100,000 | $ 100,000 | $ 100,000 | $ 746,825 |
| Net Cash Flow | 663,182 | (726,163) | (83,979) | 40,071 | (438,846) | (377,359) | (28,846) | (39,929) | (3,846) | (515,824) | (159,846) | (37,000) | (28,846) | (1,737,232) |
| DIP Draw / (Paydown) | - | 250,000 | 100,000 | - | - | - | - | - | - | 514,715 | 159,846 | 37,000 | 28,846 | 1,090,407 |
| **Ending Cash Balance** | **$ 1,410,007** | **$ 933,844** | **$ 949,865** | **$ 989,936** | **$ 551,089** | **$ 173,730** | **$ 144,884** | **$ 104,955** | **$ 101,109** | **$ 100,000** | **$ 100,000** | **$ 100,000** | **$ 100,000** | **$ 100,000** |
| **DIP Balance:** | | | | | | | | | | | | | | |
| Beginning Balance | $ - | $ - | $ 250,239 | $ 350,814 | $ 351,485 | $ 352,157 | $ 352,831 | $ 353,506 | $ 354,183 | $ 354,860 | $ 870,747 | $ 1,032,412 | $ 1,071,423 | $ - |
| DIP Draw / (Paydown) [3] | - | 250,000 | 100,000 | - | - | - | - | - | - | 514,715 | 159,846 | 37,000 | 28,846 | 1,090,407 |
| DIP Interest (PIK) | - | 239 | 574 | 671 | 673 | 674 | 675 | 676 | 678 | 1,171 | 1,819 | 2,011 | 2,078 | 11,939 |
| **Ending DIP Balance** | **$ -** | **$ 250,239** | **$ 350,814** | **$ 351,485** | **$ 352,157** | **$ 352,831** | **$ 353,506** | **$ 354,183** | **$ 354,860** | **$ 870,747** | **$ 1,032,412** | **$ 1,071,423** | **$ 1,102,346** | **$ 1,102,346** |

**Notes**
[1] Based on current or anticipated expenditures, subject to further review.
[2] Includes cash in bank and on deposit at ADP.
[3] Interim DIP draws included as a contingency to address any delays in timing of receipts.