**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| JUNO USA, LP, *et al.*,[1] | ) Case No. 19-12484 (MFW) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Re: Docket Nos. 66, 67, and 134** |
| | ) |
| | ) <u>Hearing Date:</u> |
| | ) February 5, 2020 at 10:30 a.m. |
| | ) |
| | ) <u>Objection deadline:</u> |
| | ) January 29, 2020 at 4:00 p.m. |
| | ) |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION
TO APPROVE SOLICITATION PROCEDURES AND TO THE
ADEQUACY OF THE DEBTORS' DISCLOSURE STATEMENT**

### I.    Introduction

Juno USA, LP and five affiliates filed their bankruptcy cases on November 19, 2019, and filed their proposed chapter 11 plan and disclosure statement a little less than a month later. Just after the new year, the Debtors filed a motion to approve solicitation procedures, including the forms of ballots and notices. Under section 1125, a disclosure statement must contain information of a kind and in sufficient detail that would enable a typical creditor in each class to make an informed judgment about the plan being proposed. The Debtors' plan does not inform creditors how much money is being put into the pool for creditor distributions. It does not provide information about the number or amount of claims in each plan class. It contains no liquidation analysis or financial information, foreclosing a comparison with a chapter 7

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Juno USA, LP (5772); Sabo One LLC (2759); Juno Oregon LLC (4462); Vulcan Cars LLC (4733); GT Forge, Inc. (1093); and Omaha LLC (8656). The mailing address for the Debtors listed above is 74 West Long Lake Road, Suite 205, Bloomfield Hills, Michigan 48304

liquidation. It does not explain significant pre-petition transactions, like the sale of substantial assets to Lyft or the cancellation of hundreds of thousands of restricted stock units. It provides for substantive consolidation; yet simultaneously allows the Debtors to continue to maintain their separate corporate identities. It discharges liquidating debtors. It exculpates non-fiduciaries. The solicitation procedures disenfranchise the Debtors' former drivers. Does this disclosure statement provide adequate information, and do the solicitation procedures provide proper and adequate notice?

No, they do not. The disclosure statement does not meet the Debtors' burden of demonstrating that creditors are better served by the proposed plan than a liquidation. It is missing much of the information creditors need to decide how to vote on the plan. The solicitation procedures prevent most, if not all, of the Debtors' significant creditor body from voting. The disclosure statement is inadequate. This Court should not approve it for solicitation.

## II.    Jurisdiction

1.      Under 28 U.S.C. § 1334, applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and resolve this objection.

2.      The U.S. Trustee is charged with monitoring the federal bankruptcy system by 28 U.S.C. §586. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that 11 U.S.C. § 307 gives the U.S. Trustee "public interest standing"); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3.   The U.S. Trustee has standing to be heard on the Motion under 11 U.S.C. § 307.

### III.    Background

4.      Before they stopped operating, Juno USA, LP and its associated companies
(collectively, "Juno"), operated the third largest ride-hailing business in New York City. After
Juno's November 19, 2019, bankruptcy filing, on December 3, 2019, the U.S. Trustee appointed
the Official Committee of Unsecured Creditors. On December 11, Juno filed its plan and
disclosure statement. On December 18, the Court entered a second interim order allowing Juno
to borrow up to $4.5 million in post-petition financing from GT Gettaxi, Ltd., its majority
shareholder and parent entity. Post-petition, Juno has only one employee.

5.      Before April 2017, Juno marketed itself as more socially responsible than Uber or
Lyft, because it gave its drivers the opportunity to own a stake in the company through restricted
stock units. Juno distributed those restricted stock units, which vested after some period of time,
every quarter. Drivers could cash them out after a "liquidity" event like a sale or initial public
offering.[2] Juno also only took a 10% commission from drivers; Uber and Lyft took more.

6.      In April 2017, GT Gettaxi Limited purchased Juno USA, LP and some of its
affiliates for $200 million. The stock purchase agreement made GT Forge, Inc. the general
partner of Juno USA, LP, and GT Gettaxi the limited partner. GT Gettaxi then appears to have
transferred its limited partnership interest to its own subsidiary Dooboo. Dooboo, a Cyprus
company, is GT Forge's parent. Doobo also owns Juno Lab, LLC (a Belarussian company), Juno
Lab, Ltd (an Israeli company), and Juno Lab B.V. (a Netherlands company).

7.      According to Juno's first day declaration (ECF No. 3), after GT Gettaxi acquired
it, GT Gettaxi cancelled all of the Juno drivers' restricted stock options. Drivers received about

---

[2] "Ride-sharing company Juno in its biggest fundraising round yet: source," Liana B. Baker, Reuters,
October 3, 2016 at https://www.reuters.com/article/us-juno-fundraising-idUSKCN1232A5.

\$.03 for each of their shares, and were required to waive all claims to any other compensation through the restricted stock unit program.[3]

8.      In June 2017, a group of drivers filed a class action lawsuit against Juno Inc., Juno USA LP, GT Forge, Inc., Gettaxi, Ltd., and Juno's former owner, Talmon Marco, alleging securities fraud, false advertising, and other causes of action.[4]

9.      The Juno defendants moved to dismiss the drivers' lawsuit. On January 14, 2019, the New York Supreme Court entered a decision and order granting the motions to dismiss in part, but allowing the drivers' claim for unjust enrichment to go forward. The court said:

> It is unclear at this stage of the litigation what, if any, compensation  Plaintiffs received for their services during the Pre-Launch Period. Plaintiffs performed significant services for Juno Defendants under the belief that they would receive weekly pay and equity in the company. It is highly unlikely and illogical to conclude that Plaintiffs are entitled to receive no benefit for the services they provided and that the Juno Defendants have no obligation to Plaintiffs whose allegations satisfy most of the elements of a fraudulent inducement claim. Thus, equity and good conscience require that Plaintiffs be fairly compensated for the benefit they conferred to the extent they have not been adequately compensated already. Therefore, Defendants'  motions to dismiss the unjust enrichment claim are denied.

10.     On January 6, 2020, Juno filed its motion for entry of an order approving the disclosure statement, establishing a deadline for bids to be Juno's plan sponsor, setting the confirmation schedule, and approving solicitation ballots and confirmation-related notices. (ECF No. 134)

11.     Under the proposed solicitation procedures:

---

[3] "Juno Promised Drivers Equity in the Future of Ride-Hailing and Gave Them \$100 Instead," Emma Hinchcliffe, Mashable, April 28, 2017 at https://mashable.com/2017/04/28/juno-sale-gett-drivers-response/.
[4] Second amended complaint, Docket No. 123, filed August 23, 2018, Index No. 656428/2017, Supreme Court of the State of New York.

    a.   GT Gettaxi is the stalking horse plan sponsor, and is not required to make a cash deposit to bid;

    b.   Creditors with contingent, unliquidated, or disputed claims cannot vote;

    c.   Creditors with claims that are subject to a pending objection cannot vote;

    d.   Creditors in non-voting classes will not receive copies of the plan, the disclosure statement, the confirmation hearing notice, or the solicitation procedures order;

    e.   Creditors that wish to have their claims estimated under Rule 3018 will have only 9 days to file an estimation motion;

    f.   Juno can file claims objections at any time during the voting process; and

    g.   Juno can adjourn the confirmation hearing, and, so long as it announces the adjournment in court, need not provide any other notice to parties in interest.

12.     On January 10, 2019, each of the debtors filed schedules and statements of financial affairs. Debtors Juno USA, LP, GT Forge, Inc., and Vulcan Cars, LLC each filed schedules E/F that attach a 41-page exhibit listing of all of the drivers that are parties to the class action lawsuit. (ECF Nos. 160, 151, and 153). All of the claims on the exhibit are listed as contingent, unliquidated, and disputed.

13.     The disclosure statement informs claimants that unsecured creditors have an estimated recovery percentage of [TBD], and that subordinated claims will receive nothing.

14.     In addition to scheduling drivers' claims as contingent, unliquidated, and disputed, Juno has taken the position that the drivers' class action claims are claims related to "the purchase or sale of securities" under 11 U.S.C. §510(b), and are therefore subordinated.

15.     Unless another party outbids GT Gettaxi, GT Forge will remain the parent company of the reorganized Juno and retain all of its equity interests. In that situation, it is impossible to evaluate Juno's ability to satisfy the absolute priority rule, because creditors do not know what they will be paid through the plan.

16.    The disclosure statement does not contain a liquidation analysis or any future financial projections of the business that the plan sponsor will be buying with its plan contribution. It lacks information about the number and amount of claims in each class.

17.    The plan contains the following problematic definitions:

*"Disallowed Claim"* means a Claim, or any portion thereof, that (a) has been disallowed by a Final Order, or (b) (i) is Scheduled at zero, in an unknown amount or as contingent, disputed or unliquidated and (ii) as to which the Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed under applicable law.

*"Disputed Claim"* means any Claim, or any portion thereof, that is not a Disallowed Claim, that has not been Allowed under the Plan or a Final Order of the Bankruptcy Court, and

(a) if a Proof of Claim has been timely Filed by the applicable Bar Date, such Claim is designated on such Proof of Claim as unliquidated, contingent or disputed, or in zero or unknown amount, and has not been resolved by written agreement of the parties or a Final Order of the Bankruptcy Court; or

(b) if either (1) a Proof of Claim has been timely Filed by the applicable Bar Date or (2) a Claim has been listed on the Schedules as other than unliquidated, contingent or disputed, or in zero or unknown amount, a Claim (i) as to which any Debtor has timely Filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court or for which such time period to object or File a request for estimation has not yet expired as of the applicable date of determination or (ii) which is otherwise disputed by any Debtor in accordance with applicable law, in each case which objection, request for estimation or dispute has not been withdrawn, overruled or determined by a Final Order; or

(c) that is the subject of an objection or request for estimation Filed in the Bankruptcy Court and which such objection or request for estimation has not been withdrawn, resolved or overruled by Final Order of the Bankruptcy Court; or

(d) that is otherwise disputed by any Debtor in accordance with the provisions of the Plan or applicable law, which dispute has not been withdrawn, resolved or overruled by Final Order.

*"Exculpated Parties"* means, collectively, and in each case in their capacity as such: (i) the Debtors and the Reorganized Debtor; (ii) the Creditors' Committee,

if any, and the members thereof, solely in such capacity; (iii) the Plan Sponsor; and (iv) with respect to each of the foregoing Entities, each of their respective Related Persons that served in such capacity.

"*Non-Debtor Releasing Parties*" means, collectively, the following, in each case in their capacity as such unless noted otherwise: (i) the Holders of Unimpaired Claims; (ii) each Holder of an Impaired Claim that (a) votes to accept the Plan or (b) either (1) abstains from voting or (2) votes to reject the Plan and, in the case of either (b)(1) or (2), does not opt out of the voluntary release contained in Article IX.B.2 of the Plan by checking the opt out box on the Ballot, and returning it in accordance with the instructions set forth thereon, indicating that they opt not to grant the releases provided in the Plan; (iii) each member of the Creditors' Committee, if any, and their respective Related Persons.

"*Plan Sponsor Contribution*" means the contribution by the Plan Sponsor to the Settlement Trust, in Cash, of $[●].

"*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and each of their respective subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the Petition Date, and any Person claiming by or through any of them, including such Related Persons' respective heirs, executors, estates, servants, and nominees; *provided*, *however*, that no insurer of any Debtor shall constitute a Related Person of any Debtor or the Reorganized Debtor.

"*Released Party*" and, collectively, the "*Released Parties*" means each of the following, in each case in their capacity as such: (i) the Debtors; (ii) the Reorganized Debtor; (iii) the Creditors' Committee, if any, and its current and former members; (iv) the Plan Sponsor; and (v) the respective Related Persons of each of the Entities described in each of the foregoing clauses.

18.     The plan contains the following problematic provisions:

   a.   Article IV, Section A of the plan provides that each of the debtors will maintain its separate corporate identity, but will be substantively consolidated for the purposes of claim treatment.

   b.   Article IV, Section F of the plan provides that post-confirmation, Juno will establish a settlement trust, which will be funded by the plan sponsor contribution. General unsecured creditors' only recourse will be the settlement trust. No other classes of claims will be entitled to any trust proceeds. The

plan does not disclose the settlement trustee's identity, but provides that the plan sponsor will designate the trustee. The plan provides a prospective release for the settlement trustee.

c.  Article V, Section B of the plan provides that Juno will file a schedule of assumed contracts and cure amounts with the plan supplement, but does not set a deadline by which it must file the plan supplement. This section also automatically disallows any claim filed with respect to a contract or lease that Juno assumes with no further notice or order.

d.  Article VII, Section B of the plan vests the sole authority to object to claims with the settlement trustee.

e.  Article VII, Section D of the plan allows Juno and the settlement trustee to request the Court to estimate a claim at any time, even if the Court has previously ruled on an objection to that same claim. Article VII, Section G automatically disallows the claim of any creditor that is holding property recoverable under 542, 543, 550, or 553, or that is avoidable under 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) with no further notice or order.

f.  Article IX, Section A of the plan provides that "any and all contractual, legal and equitable subordination rights . . . are settled, compromised, terminated and released pursuant hereto . . . ."

g.  Article IX, Section B of the plan, titled "Release by the Debtors and Their Estates" appears to contain non-consensual third party releases. It provides that Juno and reorganized Juno release all of the Released Parties of any and all claims (& etc.) that such "Debtor Releasing Party" holds, or "that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or the Reorganized Debtor (whether directly or derivatively) against any of the Released Parties . . . ."

h.  Article IX, Section C of the plan provides that "although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor . . . each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release."

19.   All creditors, including creditors whose claims the plan automatically disallows, are giving these releases. Creditors that cannot vote, and who are getting nothing, are also giving these releases.

20.     On January 21, 2020, the Court entered an order authorizing the Committee to conduct a Rule 2004 examination of GT Gettaxi and Juno's non-debtor affiliates. The order also requires Juno to produce documents and provide testimony regarding the 2017 GT Gettaxi purchase transaction and the 2019 sale of assets to Lyft.

21.     In its current form, the disclosure statement lacks adequate information and describes an unconfirmable plan. Thus, the U.S. Trustee brings this objection.

## IV.    Law and Argument

### A.    The disclosure statement is inadequate.

A disclosure statement, and the full and honest disclosure it should contain under section 1125, is crucial to the effective functioning of the federal bankruptcy system.[5] Section 1125 requires disclosure of adequate information, and is designed to help creditors negotiate with debtors over plan terms.[6] The Bankruptcy Code defines adequate information as "[i]nformation of a kind, and in sufficient detail . . . that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan . . . "[7] A disclosure statement must apprise creditors of the risks and financial consequences of the proposed plan on their claims in simple and clear language.[8] Section 1125's adequate information requirement establishes a floor, not a ceiling, for disclosure—plan proponents may include additional

---

[5] *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank* (*In re Oneida Motor Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)).

[6] 11 U.S.C. § 1125; *see also Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988).

[7] 11 U.S.C. § 1125(a)(1).

[8] *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

information so long as it is accurate and including it does not mislead creditors.[9] The disclosure statement requirements are designed to give creditors enough information to make an informed choice to accept or reject the proposed plan, like what they are getting, when, and what contingencies might interfere.[10] The burden of adequate information is on the plan proponent.

Reading Juno's disclosure statement results in more questions than answers. What is the plan sponsor contribution? What percentage recovery will creditors receive? How many claims are in each class and how much do they assert? If all of the drivers' claims are disallowed, how many other creditors are there? What is the basis for disallowing the claims of the drivers, who are the largest group of Juno's creditors, without notice? How can Juno maintain its separate corporate existence while at the same time having business affairs that are so hopelessly entangled that they cannot be unwound? What would creditors receive in a liquidation? Does Juno have causes of action against insiders or other parties, and how much are they worth? Juno proposes to go forward under a new "business to business" model—what are its expected revenues? Are there financial projections for the new business? If so, what valuation method do they use?

Without answers to these questions, the disclosure statement lacks adequate information and should not be approved.

---

[9] *See In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990); *In re Adelphia Commc'ns Corp.,* 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (citing *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, at 100 (3d Cir. 1988).

[10] *See In re Duratech Indus.,* 241 B.R. 291, 298 (Bankr. E.D.N.Y.); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

B. <u>The plan described in the disclosure statement is unconfirmable.</u>

Providing adequate information under section 1125 is one of the requirements for plan confirmation under section 1129.[11] Courts cannot approve a disclosure statement if the plan it describes is patently unconfirmable on its face.[12] To be confirmed, a plan must give creditors more than they would receive in a chapter 7 liquidation. [13] It is impossible to tell if this plan meets this standard, as Juno fails to provide this information. A plan must also be feasible.[14] This plan is not. A current equityholder and insider will receive the company and all of its assets while junior classes receive an unknown distribution, which may be less than they would receive in a liquidation. Juno's releases include a buried non-consensual third party release that parties cannot opt out of. Creditors receiving nothing must also give releases. The releases include, without the ability to opt out, a release of as-yet-unknown claims, even though such claims are normally not included in any release. All parties must release debtor GT Forge of all claims, with again, no ability to opt out. All contingent claims are wiped out. And creditors with claims that Juno disputes cannot vote on the plan and will receive nothing—yet are releasing all claims, even future claims. These creditors will not even receive a copy of the plan that treats them so poorly. Juno's exculpations include non-estate fiduciaries. What creditors will receive, when, and their risks, remains murky because the debtor's definition of "Allowed" and "Disputed Claims" seems to result in the allowance of approximately zero claims. These issues are but a few that render Juno's proposed plan unconfirmable. The U.S. Trustee raises these issues now only to show that

---

[11] *See* 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

[12] *See In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).

[13] 11 U.S.C. § 1129(a)(7).

[14] 11 U.S.C. § 1129(a)(11).

the plan's flaws mean that the disclosure statement cannot be approved. The U.S. Trustee reserves the right to raise these and other objections at the confirmation hearing to the extent that the plan remains unchanged at that time.

### V.    Conclusion

Juno's disclosure statement is a puzzle with pieces missing, not the full picture creditors need to determine whether to accept the plan. It does not contain adequate information. The plan it describes is unconfirmable. The disclosure statement should not be approved.

Respectfully Submitted,

Dated: January 28, 2020

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: */s/Hannah M. McCollum*
Hannah M. McCollum, Esq.
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)
Email: hannah.mccollum@usdoj.gov